TOYOMENKA (AMERICA), INC., Plaintiff-Appellant, v. COMBINED METALS CORPORATION, Defendant-Appellee.

First District (5th Division)   No. 84–0569

Opinion filed December 31, 1985.

Jared Kaplan, Dennis C. Waldon, and Weston W. Hanscom, all of Keck, Mahin & Cate, of Chicago, for appellant.

Daniel C. Meenan, Jr., and Ira N. Helfgot, both of Feiwell, Galper & Lasky, Ltd., of Chicago, for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Counterdefendant Toyomenka (America), Incorporated, appeals from a $7,589.65 judgment entered against it following a trial on the counterclaim of counterplaintiff Combined Metals Corporation alleging Toyomenka's breach of certain express and implied warranties concerning steel sold to Combined. On appeal Toyomenka contends: (1) Combined failed to establish that it had properly revoked its acceptance of the steel; (2) Combined failed to establish that Toyomenka breached any express or implied warranties concerning the steel; (3) even assuming such a breach, Combined was not entitled to recover the price of the steel.

We affirm.

At trial the following pertinent testimony was adduced. Walter

Hauk, president of Combined, testified that Combined was in the business of processing and distributing stainless steel. He had purchased over 1,000 tons of stainless steel from Toyomenka since 1972, dealing primarily with Casey Yawata, the manager of Toyomenka's stainless steel department.

In February 1979, the steel at issue was ordered from Toyomenka at a price of $5,589.65. Confirmation of sale was received in March, and delivery was accepted in September 1979. At a cost of $2,000, Combined had a processor cut the steel into sheets and then shear it into narrow strips, all according to the specifications of its customer, Teletype Corporation.

In October 1979 the processed steel was shipped to Teletype. Subsequently a letter was received from Teletype and Combined notified Casey Yawata that the steel was too soft. Teletype subsequently rejected the steel in a letter sent in February 1980.

Walter Hauk testified that it was the custom in the industry for general application commercial quality 409 stainless steel (the type at issue here) to have a hardness rating of 70 to 80 on a Rockwell B scale. Hauk also testified that Casey Yawata knew of these requirements.

According to Hauk, it was also the custom and practice in the industry to send with the first shipment of steel a certification of the physical and chemical properties of the steel. It was industry practice that each subsequent shipment would meet the specifications of the certificate. Hauk testified that in past dealings Toyomenka had followed this practice and had sent shipments which absolutely conformed to those specifications. This testimony as to general industry practice was corroborated at trial by Brandon Jacobson, who had worked in the stainless steel industry for 25 years as a marketing and product manager.

According to Walter Hauk, the certification sent by Toyomenka with its first shipment indicated that the hardness of the steel was 128 on a Vickers scale. After Combined reported its customer's complaint to Toyomenka, Casey Yawata sent Combined a letter indicating that a hardness of 128 Vickers was equivalent to 71.3 Rockwell B. Yawata subsequently sent Combined an industry conversion chart with this same conversion from Vickers to Rockwell B underlined.

John Kitson, manager of a physical testing laboratory, testified that he tested samples of the steel in March 1982, and found hardness values from 61 to 62.5 on a Rockwell B scale.

Walter Hauk had also testified that Toyomenka rejected Combined's demand that they accept the material back and credit Com-

bined for its cost. The steel remained in a Combined warehouse at the time of trial. Toyomenka has conceded on appeal that this steel, as processed, was worthless if not suited to the needs of Combined's customer.

Toyomenka established at trial that its March 1979 sale-confirmation letter had stated that the chemistry and mechanical properties of the steel was subject to specifications contained in an attached brochure. According to John Sirovi, the brochure then in effect stated that the hardness of the steel was no greater than 80 Rockwell B. However, Walter Hauk testified that although he was familiar with the brochure, he was not certain whether it had been attached to the confirmation received by Combined. John Sirovi also conceded that it was industry practice for products to conform to the mill certificates issued which showed typical mechanical properties such as hardness.

Toyomenka's final witness was Lyle Jacobs, a metallurgical engineer with 27 years' experience in the field. Jacobs testified that to an engineer the two most important properties of steel were tensile strength (the load required to break the metal by pulling it apart) and yield strength (the force required to produce a permanent deformation in the metal). It is undisputed that his tests established that the steel in question met the requisite specifications for these two properties.

Jacobs also testified that another generally accepted quality control test in the industry was for hardness, the metal's resistance to penetration. This could be tested on a Rockwell machine, yielding values on various scales including Rockwell B. Testing samples of the steel on this machine, he found hardness values ranging from 58 to 67 Rockwell B.

Jacobs testified that a second method of determining hardness was by using a micro-hardness tester. This provided a much more sensitive test because a much lighter load was used. The machine he used could obtain hardness values on a Knoop scale or a Vickers scale, depending on the type of point used. Those values could be accurately converted one to the other, because the same basic machine was used. Using this machine, he determined that the steel had a Vickers hardness value ranging from 116.5 to 141. In Jacobs' opinion these values did not differ substantially from the 128 Vickers specification in the certification provided by Toyomenka.

Using the same conversion scale relied on by Combined, Jacobs determined that the micro-hardness values he had found were roughly equivalent to a range of 65.5 to 77 Rockwell B. However, he also cautioned that truly accurate results could only be obtained by testing

with a machine that measured hardness in the scale at issue (a Rockwell machine for any of the Rockwell scales or a micro-hardness tester for Knoop or Vickers scales).

According to Jacobs, the steel also met the hardness standards of the American Society for Testing Material, one of the two organizations establishing standards for the American market. This was because ASTM only required that this type of steel have a hardness value less than or equal to 80 Rockwell B, and none of the Rockwell B results exceeded this level.

Jacobs testified that he did not know why ASTM did not specify a minimum hardness. He initially indicated that to his knowledge this type of steel could not be too soft for commercial use. However, he then testified that he did not know without testing it whether such steel, with a hypothetical Rockwell B value of 45, could pass the applicable yield strength and tensile strength specifications.

At the conclusion of the trial, the court entered judgment for Combined in the amount of $7,589.65 ($5,589.65 for the purchase price and $2,000 for the cost of processing the steel).

OPINION

■ Toyomenka first contends that Combined did not effectively revoke its initial acceptance of the steel because Combined's attempted revocation came after Combined had substantially changed the condition of the steel.

Section 2—608(2) of the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 2—608(2) provides that revocation of acceptance must occur "before any substantial change in the condition of the goods which is not caused by their own defects." It is undisputed that in this cause Combined made no attempt to revoke its acceptance of the steel until after a processor had cut the steel into sheets and then sheared it into narrow strips, all in accordance with the specifications of the ultimate customer. It is also undisputed that, assuming the steel was too soft for that customer's use, the processing had rendered the steel worthless. Accordingly, we agree with Toyomenka that Combined, after having substantially changed the condition of the steel, could not subsequently revoke its acceptance.

This conclusion does not, however, preclude Combined from recovering damages. As Toyomenka notes in its initial brief before this court, section 2—607 of the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 2—607) governs this situation. That section provides in pertinent part that although acceptance of goods precludes their rejection and may preclude revocation of acceptance, such acceptance

does not impair any other remedy provided for nonconforming goods. The section further provides that the burden is on the buyer to establish any breach. In this cause, Combined alleged that Toyomenka had breached express and implied warranties concerning the hardness of the steel.

■ We first consider Combined's contention that Toyomenka breached an implied warranty concerning the hardness of the steel. Section 2—314 of the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 2—314) provides that in addition to the implied warranty of merchantability which may arise from the sale of goods by a merchant, other implied warranties may arise from course of dealing or usage of trade.

In this cause Combined's president, Walter Hauk, testified that it was the custom in the industry for the type of steel at issue here to have a hardness range of 70 to 80 on a Rockwell B scale. It is undisputed that samples of the steel at issue, when measured by Rockwell scale instruments, were found to have hardness values which were all below this range, varying from 58 to 67 Rockwell B.

Toyomenka contends that no breach was established because its expert, Lyle Jacobs, concluded from his tests that the steel conformed to specifications in the industry. Jacobs testified that the ASTM standards did not specify a minimum hardness for this type of steel, requiring only that it not exceeded a maximum hardness of 80 Rockwell B. Toyomenka contends that because it is undisputed that the steel did not meet the sole ASTM hardness standard, Combined cannot be heard to contend that other non-ASTM hardness standards were not met, citing *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.* (10th Cir. 1975), 516 F.2d 33. In *Mustang* the court, *inter alia*, affirmed summary judgment for the defendant pipe manufacturer against the plaintiff-buyer's claim of a breach of the implied warranty of merchantability. In *Mustang* it was undisputed that the parties had agreed that the pipe was to be manufactured in accordance with the standards of the American Petroleum Institute (API). The reviewing court upheld the district court's finding that the pipe, which subsequently ruptured and exploded, met all pertinent API standards. In rejecting the buyer's claim that the pipe did not comply with the implied warranty of merchantability, the reviewing court noted that the buyer in its brief had conceded that if the pipe had been manufactured in accordance with API standards it would be merchantable.

No such concession has been made here. Lyle Jacobs could not explain why ASTM did not have a minimum hardness standard for this type of steel. Although he first testified that to his knowledge no

hardness value could be too low for commercial use, he also testified that without first testing it he could not say whether steel with a hardness value of 45 Rockwell B would meet applicable tensile strength or yield strength specifications. The trial court evaluated this testimony along with that of Walter Hauk concerning the custom and usage in the industry and determined that "the parties contemplated in their agreement and trade and industry requirements are that 409 steel have an absolute maximum hardness of 80 Rockwell B and a reasonable or approximate hardness—minimum hardness of 70 Rockwell B." Walter Hauk's testimony had also established that the steel was rejected because of its softness. The court evaluated all of this evidence and concluded that because the steel at issue did not meet these hardness levels, as measured by all the Rockwell tests, Toyomenka had breached an implied warranty that the steel would meet these standards.

This determination was properly one for the trial court, as the finder of fact, to make. (*Collum v. Fred Tuch Buick* (1972), 6 Ill. App. 3d 317, 285 N.E.2d 532.) We find this determination to have been amply supported by the evidence and consequently will not disturb it on appeal. Because of this determination we need not reach the other contentions of the parties concerning the existence and breach of other express or implied warranties.

■■ Finally, Toyomenka contends that, even assuming a breach, Combined was only entitled to the difference in value of the goods as accepted (before being processed) and their value had they been as warranted, citing section 2—714(2) of the Uniform Commercial Code. That section states:

> "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, *unless special circumstances show proximate damages of a different amount.*" (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 26, par. 2—714(2).)

These remedies provided by the Code are to be liberally administered, with the goal of placing the aggrieved party in as good a circumstance as if the other party had fully performed. *McGrady v. Chrysler Motors Corp.* (1977), 46 Ill. App. 3d 136, 360 N.E.2d 818.

■■ Combined presented evidence tending to establish that when it received steel warranted by the seller to have a hardness rating sufficient to meet the custom in the industry, it had that steel processed to its customer's specifications, at a cost of $2,000. After the customer received this steel, it notified Combined that it was too soft.

It is undisputed that the processed steel was now worthless if not fit for the customer's use. Combined had purchased the steel for $5,589.65. Based on this evidence we find that the trial court did not err in determining that Combined's damages were the sum of the contract price and the processing fee, or $7,589.65.

The judgment of the trial court is affirmed.

Affirmed.

MEJDA, P.J.,* and PINCHAM, J., concur.

---

*This opinion was concurred in prior to the retirement of Presiding Justice Mejda from the court.