DYNAMIC RECYCLING SERVICES, INC., Counterplaintiff-Appellee and Cross-Appellant, v. SHRED PAX CORPORATION, Counterdefendant-Appellant and Cross-Appellee.

Second District No. 2—90—0565

Opinion filed March 18, 1991.

Michael R. Dockterman, of Wildman, Harrold, Allen & Dixon, of Chicago (Aaron T. Shepley, of counsel), for appellant.

Rathje, Woodward, Dyer & Burt, of Wheaton (Gary L. Taylor, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Dynamic Recycling Services, Inc., brought this cause as a counterclaim against Shred Pax Corporation in an underlying action where the parties were codefendants. The underlying action has no relevance to the present case. Therefore, in order to avoid any confusion which might result from referring to the parties as counterplaintiff and counterdefendant, we shall designate them only as plaintiff and defendant. Shred Pax (defendant) appeals from a judgment entered against it on one count of Dynamic's counterclaim, and Dynamic

(plaintiff) cross-appeals from the trial court's denial of its prayer for consequential damages. We affirm.

The facts of this case may be distilled from the evidence presented at trial. In the spring of 1984, Charles Bendig and Thomas Duffy decided to go into the business of disposing of used auto and truck tires. They formed Dynamic, with Bendig as the company's president. After investigating various methods of disposal, Bendig and Duffy decided that the most financially feasible alternative was to shred used auto tires and discard the shreddings at a landfill. However, they lacked experience and expertise in regard to the mechanics involved in a shredding operation. Accordingly, they contacted Shred Pax and inquired whether any Shred Pax machines were capable of shredding tires. They received an affirmative answer and discussed the matter further with Shred Pax.

Subsequently, after receiving a referral from Shred Pax, Bendig and Duffy traveled to New York to see Shred Pax shredders in operation at a facility owned by Ernie Force. Force, who had been in the tire recycling business for 14 years, had used several different models of Shred Pax machines to shred tires. Bendig and Duffy discussed with Force the daily operation of his business, and Bendig's brother, Ronald, later spent a week at Force's facility observing and learning the business.

On July 24, 1984, Dynamic received a written proposal from Shred Pax for the sale of a new model AZ-45 shredder at a price of $64,895. On September 6, 1984, Dynamic received another written proposal from Shred Pax, this time for the sale of a remanufactured AZ-45 shredder, at a cost of $49,500. Both of the Shred Pax proposals included warranty provisions with virtually identical language. The September proposal was accompanied by a letter which stated that the remanufactured unit carried "the same 90-day unconditional guarantee as a new machine." Dynamic ultimately purchased the remanufactured machine, and Ronald Bendig picked it up from Shred Pax late in February 1985.

Before putting the AZ-45 into operation, Dynamic bolted metal I beams to the bottom of the shredder. The I beams enabled Dynamic to lift the shredder and set it atop a dumpster so that during operation the shredded tire particles would fall into the dumpster. However, Dynamic was unable to use the shredder immediately because of an electrical problem in the company's facility. On March 8 Dynamic rented an appropriate generator and began to operate the shredder but noticed problems almost right away. While the machine shredded the tires fed into it with no apparent difficulty, the shredded material

would not properly fall away from the machine into the dumpster even though there was approximately eight feet between the bottom of the shredder and the floor of the dumpster. It appeared that the shreddings were somehow being drawn back into the cutting area, and after 40 or 50 tires were shredded the machine would become clogged and bound with shreddings. Dynamic employees would then have to clear it manually. As a result, Dynamic was able to shred only 200 to 250 tires per day. There was testimony that the AZ-45, when working properly, was capable of shredding one tire every seven seconds, or about 500 an hour.

Charles Bendig phoned Shred Pax and requested help in determining what was wrong. Bendig testified that Al Kaczmarek, president of Shred Pax, came to Dynamic and investigated the problem. On Kaczmarek's recommendation, according to Bendig, Dynamic removed one set of "side fingers" from the shredder, but the machine continued to clog.

Bendig called Kaczmarek, who again went to Dynamic's site. This time, according to Bendig, Kaczmarek recommended that a conveyor belt be attached to the machine to carry the shreddings away. Kaczmarek denied that he or Shred Pax ever made such a recommendation. He did, however, testify that the clogging of Dynamic's machine occurred because the shredded tires were not being cleared away from the cutting surface of the machine quickly enough, thereby causing a "bridging" problem and backup of the shreddings into the hopper of the shredder. Dynamic installed a conveyor belt, but, according to Kaczmarek's testimony, he later told Bendig that the belt was not mounted properly in that there was not sufficient clearance between the belt and the cutting knives. Dynamic presented evidence to show that it had installed the conveyor in accordance with Kaczmarek's specifications. Dynamic did not change or reinstall the conveyor belt.

As of mid-April 1985 the shredder was still not operating correctly even with the conveyor belt in place. Kaczmarek visited the site once more and, according to Bendig, recommended that a stream of water be installed to act as a lubricant for the shredded material. When asked by plaintiff's counsel if Shred Pax had recommended the addition of a water distribution system, Kaczmarek responded, "Possibly." The water was added by Dynamic but did not relieve the clogging problem. At this time Bendig told Kaczmarek that Dynamic could not keep operating if the shredder could not do its job and asked that Shred Pax take the machine back. Kaczmarek responded that he did not want to take it back but would try to sell it for Dynamic.

Early in May Shred Pax's chief engineer, Win Kaczmarek, went to check the shredder regarding a possible bad bearing. According to Bendig's testimony, Win Kaczmarek told him he was not surprised the shredder was not operating properly because it was not set up to shred auto tires but rather for truck tires. Bendig testified that, when he told Al Kaczmarek about this, Kaczmarek responded that Dynamic could buy new knives and other parts to correct the problem and have the parts installed, at a total cost of about $14,000. Not long after this, Bendig told Al Kaczmarek that Dynamic was going out of busi-. ness and asked that Shred Pax take back the AZ-45. Kaczmarek again refused but indicated he would try to sell the machine. Dynamic subsequently stopped all operations and stored the shredder, first in a semitrailer and later on its site but not sheltered. At the time of trial the shredder remained in Dynamic's possession.

Dynamic offered evidence to show that, as a result of the shredder's failure to function properly, it had lost its customers and future profits and had suffered a monetary loss in disposing of the tires it had not been able to shred. The total amount of losses claimed by Dynamic was $32,377, not including the cost of the shredder.

In May 1986 Dynamic's attorney wrote to Shred Pax indicating that Dynamic revoked its acceptance of the shredder, and in February 1987 Dynamic filed this counterclaim. Count I of the counterclaim alleged that Shred Pax had breached an express warranty. Counts II and III alleged breaches of the implied warranties of merchantability and fitness for a particular purpose. In count III Dynamic alleged that it had revoked its acceptance of the shredder, and count V alleged a third-party beneficiary claim. The trial court found in favor of Shred Pax on all counts except count II, which alleged a breach of the implied warranty of merchantability. On count II the court awarded Dynamic damages in the amount of $49,500, which was the amount Dynamic had originally paid for the shredder. After its post-trial motion was denied, Shred Pax timely filed this appeal, and Dynamic filed a cross-appeal from the trial court order denying it consequential damages.

Shred Pax urges initially that the finding of a breach of the implied warranty of merchantability cannot stand because it is inconsistent with the finding in its favor on the count for implied warranty of fitness for a particular purpose. Shred Pax takes the position that the trial court's decision on the fitness count implied that it had made a determination that the shredder was fit for its particular purpose. Defendant then argues that it is legally inconsistent for the court to have found that the shredder, even though it was fit for its particular

purpose, was not merchantable, *i.e.*, not fit for the ordinary purposes for which it is used. (Ill. Rev. Stat. 1987, ch. 26, par. 2—314(2)(c).) Dynamic responds that the record does not support the assumption made by Shred Pax that the trial court had found the shredder to be fit for its particular purpose. We agree with Dynamic.

The trial court did not make findings of fact relative to either of the warranties under discussion. Shred Pax cites the rule that, when the judgment of the trial court is not supplemented by findings of fact, a presumption may be made that the trial court found all controverted facts in favor of the prevailing party. (*Century 21 Castles By King, Ltd. v. First National Bank* (1988), 170 Ill. App. 3d 544, 549.) This rule, however, assumes the court actually considered disputed facts in arriving at a conclusion. The record here indicates that the trial judge never even dealt with factual questions relating to the fitness warranty because Shred Pax had convinced him the warranty was not applicable.

In its amended answer to plaintiff's counterclaim, Shred Pax alleged that Dynamic was not entitled to an implied fitness warranty because such a warranty had been excluded by the written warranty Shred Pax had given on the shredder. Both proposals made to Dynamic included warranty language. While Shred Pax's counsel indicated that the warranty printed on the first proposal was the effective one, the two warranties were virtually identical in wording, and both proposals were admitted as evidence. During closing argument, counsel for Shred Pax contended that the implied fitness warranty had been excluded by the language used in Shred Pax's own warranty and cited to the court the statutory basis which permitted such an exclusion. This argument was then addressed at some length during rebuttal. Dynamic's counsel particularly focused on the warranty of merchantability and cited the court to both statutory language and case law to show that defendant had not excluded that warranty.

■■■ The statute referred to by both counsel is section 2—316 of the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1987, ch. 26, par. 2—316). The relevant language of the statute provides:

> "[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the de-

scription on the face hereof.' " (Ill. Rev. Stat. 1987, ch. 26, par. 2—316(2).)

The pertinent language of the warranty given to Dynamic, as found in Shred Pax's first proposal, is as follows:

> "Such repair or replacement by Shred Pax Corporation or its dealers constitutes a discharge of all S.P.C. liabilities. The foregoing Warranty is exclusive and in lieu of all other warranties whether written, oral or implied."

The parties did not dispute that implied warranties can be excluded if the exclusionary language meets the statutory standard.

When the court rendered its decision it addressed each count of the counterclaim individually. The judge first disposed of counts I, IV and V, as well as the question of consequential damages. The court then said:

> "However, the plaintiff was a buyer and—the defendant was a seller and the plaintiff was a buyer of a remanufactured AZ-45 which failed to meet the implied warranty of merchantability.
>
> Neither of the warranties in Plaintiff's Exhibit 1 or 2 conspicuously exclude or modify the implied warranty of merchantability."

During trial the judge had been presented with exhibits, statutes, case law, and arguments regarding the exclusion of implied warranties. Judging from his remarks, he had carefully considered all of the above in order to determine that the implied warranty of merchantability had not been excluded. We note that the statute allows exclusion of the implied fitness warranty and that Shred Pax's warranty includes language which could lead the trial court to determine that it had been excluded. Since this is precisely what counsel for Shred Pax argued, we think it is reasonable to conclude that the trial court was persuaded that Shred Pax had successfully excluded the implied warranty of fitness for a particular purpose. In such case, the trial court did not need to decide whether, as a matter of fact, the shredder was fit for a particular purpose. We are of the opinion that the lower court did not make any factual determinations on this matter. Accordingly, the trial court's holding in favor of Shred Pax on plaintiff's count for breach of the implied fitness warranty does not imply that the court found the shredder to be fit for a particular purpose. It follows that the lower court's holding regarding the warranties of fitness and merchantability are not inconsistent and may be allowed to stand.

■■ ■ Shred Pax next avers that the evidence does not support the finding of the trial court that there was a breach of the implied

warranty of merchantability. Specifically, Shred Pax argues that (1) there was insufficient evidence that the shredder was not merchantable, (2) Dynamic cannot recover because it improperly operated the machine, and (3) Dynamic failed to establish that there was a defect in the shredder when it left Shred Pax's control. Resolution of each of these claims turns in varying degrees on disputed factual questions. In a bench trial, the judge, as the trier of fact, is in a superior position to make determinations about the credibility of the witnesses and the weight to be given their testimony. (*Aetna Insurance Co. v. Amelio Brothers Meat Co.* (1989), 182 Ill. App. 3d 863, 865.) Moreover, a trial court's finding will not be disturbed on review unless it is manifestly against the weight of the evidence. *Century 21 Castles By King, Ltd. v. First National Bank* (1988), 170 Ill. App. 3d 544, 549.

■■ The parties agree that goods are merchantable when they are fit for the ordinary purposes for which such goods are used. (Ill. Rev. Stat. 1987, ch. 26, par. 2—314(2)(c); *Crest Container Corp. v. R.H. Bishop Co.* (1982), 111 Ill. App. 3d 1068, 1073.) Shred Pax insists that the ordinary purpose of the shredder was to shred tires and that the evidence showed the machine did that job. Dynamic admits that there was a showing that the AZ-45 shredded tires but points to the testimony that it also clogged after 40 to 50 tires and urges that the concept of merchantability must be examined in the context of the parties' contractual agreements. We agree with Dynamic's position insofar as it means all of the evidence must be considered.

■■ Undisputed testimony revealed that the AZ-45 would successfully shred the first 40 to 50 tires that were placed into it. However, the bald fact that it would shred *some* tires, when weighed against all the other evidence, is not enough to establish that the machine was merchantable. The trial court correctly considered the totality of the evidence in order to determine the ordinary purposes for which the AZ-45 was used and whether the shredder sold to Dynamic was fit for those purposes.

There was abundant evidence that the shredder was supposed to be able to shred auto tires in far greater volume and for longer periods of time than it was doing for Dynamic. Charles Bendig and Thomas Duffy had explained to a Shred Pax salesman that they needed a shredder in order to operate a tire disposal business. The salesman assured them the AZ-45 would fit the bill. A Shred Pax sales brochure regarding the model AZ-45 indicated:

"The **AZ-45 Model** has extensive versatility and capacity. It handles up to 2,000 pounds of Type-O waste per hour under controlled input."

Al Kaczmarek testified that the maximum capacity of the AZ-45 was one tire every seven seconds. Ernie Force, who had used Shred Pax AZ-45's to shred tires in his tire recycling business, testified that the AZ-45 "shreds about, I guess, three hundred an hour, four hundred an hour, depending on the size of the tire." Shred Pax's first proposal, for a new AZ-45, specified that the intended usage was: "To shred approximately 250 car tires with a 2+2+2 system." Based on the other evidence it can safely be assumed the proposal meant the machine could be expected to shred about 250 car tires per hour. Charles Bendig's testimony was that he understood the shredder was "to do a minimum of 250 tires an hour as a used machine."

Even taking into consideration that the shredder Dynamic purchased was remanufactured rather than new, we think the trial court could reasonably conclude from this evidence that the ordinary purpose of the AZ-45 purchased by Dynamic was to shred a minimum of 250 auto tires in an hour and to do so on a continuous basis.

Dynamic's evidence on the unfitness of its shredder must be viewed in light of the "ordinary purpose" set out above. The evidence showed that Dynamic's shredder would shred only 40 to 50 tires and then bind up such that the whole process would have to be stopped, the machine cleared, and the process started over again. Charles Bendig testified that the shredder clogged at least four or five times a day and that Dynamic was only able to shred about 200 tires per day. Shred Pax never seriously disputed that the machine would process only so many tires and then stop. In light of the "ordinary purpose" of the AZ-45, the evidence that Dynamic's shredder was unfit fully supports the trial court's finding that Shred Pax breached the implied warranty of merchantability.

Shred Pax also attacks the trial court's judgment on the ground that Dynamic is precluded from recovery because it improperly operated the AZ-45 shredder. Defendant claims that, while the shredder was supposed to shred tires one at a time, Dynamic would put 25 tires in at once and then fail to clear out the shreddings that collected underneath the machine, thus preventing it from working properly. Shred Pax also charges that Dynamic improperly installed a conveyor belt on the shredder.

■ Shred Pax's allegation that Dynamic overloaded the shredder is not supported by the record. Shred Pax claims that Richard Jarvis, an employee of Dynamic, testified that 25 tires would be dumped into the machine all at once, causing an accumulation of shredded material. What Jarvis actually testified to, on cross-examination, was that 25 or 30 tires were loaded on to a pallet and moved close to the

shredder by a forklift. On direct, Jarvis clearly testified that the Dynamic employees usually only loaded one tire at a time. When they would see one tire grab, they would throw another one in. Shred Pax's allegation is baseless.

With regard to Shred Pax's allegation that Dynamic improperly installed a conveyor belt, thus causing the machine to malfunction, we observe initially that several of Dynamic's witnesses testified that the machine was binding and stopping before the conveyor belt was installed. Nevertheless, as to the issue raised by Shred Pax, Dynamic does not dispute that it added a conveyor belt. However, both Charles and Ronald Bendig testified that Al Kaczmarek recommended that the belt be installed. Ronald Bendig, who indicated that he had had experience working with conveyor belts when he was a shop supervisor for a conveyor company, testified that he had installed the belt according to Kaczmarek's directions. Kaczmarek, on the other hand, denied both making a recommendation regarding a conveyor belt and providing directions for installation of such a belt. He also testified that the conveyor belt had been installed too close to the cutting surface of the shredder and was the cause of the "bridging" which prevented the shredder from operating properly. In a bench trial it is for the judge to pass on the credibility of the witnesses and resolve questions of fact, and the trial court's decision should not be overturned unless it is against the manifest weight of the evidence. (*Abatron, Inc. v. Fulton Contracting Co.* (1988), 175 Ill. App. 3d 692, 700.) If believed, Dynamic's evidence supports the trial court finding that the company's installation of a conveyor belt did not cause the problem with the shredder and, therefore, was not a bar to recovery.

Shred Pax's final contention regarding insufficient evidence is that Dynamic failed to show that there was a problem with the shredder when it left Shred Pax's control. Essentially, Shred Pax's argument is that most of the evidence indicated that the trouble with the shredder occurred after Dynamic bolted I beams and attached a conveyor belt to the machine.

It is uncontested that Dynamic attached the I beams to the shredder in order to raise the machine prior to using it. However, we are unable to find even a hint of evidence in the record to intimate that the I beams had any effect of any sort on the functioning of the AZ-45. In the absence of evidence, the trial court could have concluded the addition of the I beams was not related to the dysfunction of the shredder.

As for the attachment of the conveyor belt, it is true that testimony was given that the machine clogged after the conveyor was

added, but there was also ample evidence that the shredder was not working properly from the very first time it was turned on. It is apparent from the record that the machine was initially operated without the conveyor. Charles Bendig testified that he noticed at the outset that the machine would tear the tires apart but they would not empty out of the machine. He said the tires "would stay clogged and circulate around the cutters in the machine." Richard Jarvis indicated that the shredder clogged and that "the tires couldn't fall out of the bottom of the machine. They would gather in the forks and knives." According to Ronald Bendig's testimony, he observed "a large amount of rubber and steel clinging to the underside of the shredder itself. It was never able to clean itself out, in my opinion, of the debris that was underneath." Dynamic's witnesses also testified that the shredder was initially placed on top of a dumpster so the shreddings could fall into the dumpster. The conveyor was added only after they saw that the shredded material was not falling and the machine was binding. Finally, Charles Bendig testified that Win Kaczmarek told him the AZ-45 was set up to shred truck tires rather than auto tires. It is not contested that Shred Pax set up the machine prior to delivery.

 ▌ Cumulatively, the evidence was adequate to persuade the trial court that the problem with the AZ-45 existed when the machine left Shred Pax's control. In *Burrus v. Itek Corp.* (1977), 46 Ill. App. 3d 350, the court stated that the fact that the defects complained of by the buyer were apparent immediately after delivery was "strong evidence" against a finding that the problems were caused by the buyer's improper maintenance after delivery. (*Burrus*, 46 Ill. App. 3d at 355.) Likewise, in this case we think the failure of the shredder to operate properly at the outset is strong evidence against a finding that the problems were caused by either Dynamic's modifications or improper operation of the machine. The finding of the trial court is not against the manifest weight of the evidence unless an opposite conclusion is clearly evident. (*In re Application of Kane County Collector* (1985), 135 Ill. App. 3d 796, 805.) A conclusion opposite to that reached by the trial court is not clearly evident to us.

We now consider Shred Pax's final claim, that Dynamic was awarded an excessive amount of damages. Defendant takes the position that the Uniform Commercial Code (Ill. Rev. Stat. 1987, ch. 26, par. 1—101 *et seq.*) permits the limitation of remedies for breach of the implied warranty of merchantability and that, through the language of the warranty on the AZ-45, it effectively limited Dynamic's remedies to repair or replacement of the nonconforming shredder.

■■ ■ We acknowledge that the Code allows limitation of remedies and that Shred Pax's warranty included limiting language. Nevertheless, as prompted by plaintiff, we look to section 2—719(2) of the Code (Ill. Rev. Stat. 1985, ch. 26, par. 2—719(2)), which provides:

> "(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."

The evidence in this case is sufficient to sustain a finding that the limited remedy espoused by Shred Pax failed of its essential purpose.

When it contracted with Shred Pax for the AZ-45, Dynamic knew that the remedy for breach was limited to repair or replacement. But it could not have not known that when a breach occurred Shred Pax would refuse to honor the very remedy it had chosen to offer Dynamic. Dynamic was entitled to expect Shred Pax to repair or replace within a reasonable amount of time after Shred Pax became aware that the shredder did not conform to the contract. See *Adams v. J.I. Case Co.* (1970), 125 Ill. App. 2d 388.

The record leaves little, if any, doubt that Dynamic contacted Shred Pax immediately upon discovering that the shredder was not performing properly. Dynamic subsequently communicated not once, but many times, with Shred Pax, seeking and following its advice and asking for assistance. Finding its efforts to be of little avail with regard to the solution of the clogging problem, Dynamic finally asked Shred Pax to take the machine back but again received no satisfaction. Dynamic subsequently went out of business and stored the shredder. For Shred Pax to now insist on remedying its breach by repairing or replacing the machine is no remedy at all. Shred Pax's limited remedy must be read to include a requirement that repair and replacement be performed within a reasonable time of discovery of the breach. Under the circumstances of this case a reasonable time would have been before Dynamic started losing customers and going out of business.

The evidence shows Shred Pax had been made aware that Dynamic was just starting out in business, its only business was tire disposal, and the success of the business was entirely dependent upon the peak operation of the shredder. Furthermore, Charles Bendig testified that he alerted Al Kaczmarek that Dynamic was having financial problems because the machine was experiencing so much down time. Despite its awareness of Dynamic's precarious position, Shred Pax failed to honor its warranty. After Dynamic ceased operations the warranty amounted to little more than a hollow and useless promise. Consequently, the limited remedy set forth in Shred Pax's warranty

has failed of its essential purpose, and Dynamic's recovery is not limited to repair costs.

■■ ■ Shred Pax argues further that even if Dynamic is entitled to damages, the amount of damages must be limited to what is prescribed by the Code. Defendant states that the Code's measure of damages is the difference between the value of the goods accepted and the value they would have had as warranted (see Ill. Rev. Stat. 1987, ch. 26, par. 2—714(2)), rather than the purchase price of the nonconforming goods, such as was given to Dynamic. We agree with Shred Pax's delineation of the measure of damages for breach of warranty but find that we must look beyond the measure itself to the language in section 2—714(2) which allows an exception to be made to the general rule when "special circumstances show proximate damages of a different amount." (Ill. Rev. Stat. 1987, ch. 26, par. 2—714(2).) The "special circumstances" exception must be viewed in light of section 1—106 of the Code, which provides that the remedies found in the Code "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." (Ill. Rev. Stat. 1987, ch. 26, par. 1—106(1).) Upon reading these two sections together and applying them to this case, we find that the trial court exercised sound discretion in awarding Dynamic the amount it had paid for the shredder.

■■ Section 2—714(2) seeks to make an aggrieved buyer whole again, at least in economic terms. When the section is applied, the buyer keeps the nonconforming goods but is given damages to make up for the decreased value of those goods. This approach assumes the goods have value for the buyer. The measure of damages of section 2—714(2) would have been an adequate measure in this case if Shred Pax had paid damages to Dynamic in a timely fashion following delivery of the nonconforming shredder. At that point in time the machine, even though not working quite right, had great value for Dynamic. If damages had been paid, Dynamic might have had the shredder repaired and, in that way, been made whole. Instead, at least in part due to the shredder not working right, Dynamic closed up, and the AZ-45 was relegated to storage. There was evidence that even after Dynamic shut down, both Dynamic and Shred Pax tried unsuccessfully to sell the AZ-45. At this point the shredder, being of no use, and evidently not being saleable, had no value to Dynamic. Thus, Dynamic could not be made whole by an award in an amount equal to only the decreased value of the shredder. In our view these facts reveal the kind of special circumstances in which the Code allows damages in an amount greater than that prescribed by section 2—714(2).

A conclusion similar to the one we reach here was reached by the court in *Toyomenka (America), Inc. v. Combined Metals Corp.* (1985), 139 Ill. App. 3d 654, where the processed steel sold to the buyer was found to be not fit for the use of the buyer's customer. It was not disputed that the steel was worthless if not fit for the customer's use. Citing the "special circumstances" exception and the mandate of the Code that its remedies are to be liberally administered, the court awarded the buyer the contract price and consequential damages. As it did in *Toyomenka*, the "special circumstances" provision of the Code justifies the damage award to Dynamic in an amount equal to the purchase price of the shredder.

■■■ Turning now to Dynamic's contention that the trial court should have awarded it consequential damages, we find that Dynamic offers little support for its position. In essence, Dynamic argues that it is entitled to consequential damages because it showed that Shred Pax's limited remedy failed of its essential purpose. While this may or may not be true, it is not relevant because, judging from the record, it does not relate to the grounds for the trial court's decision. When announcing its disposition of this case, the trial court said relative to this issue:

> "The proffered evidence of consequential damages is inconclusive and therefore, it does not rise to the level of more probably true than not true."

It is apparent the court had not been persuaded by Dynamic's proof that Dynamic was entitled to $32,377 in consequential damages. Thus, it does not matter whether Dynamic had shown the failure of the limited remedy since that was not the basis for the court's finding. Moreover, nowhere does plaintiff make an argument that the court's decision was not supported by the evidence. As far as we can discern, plaintiff has neither asserted nor demonstrated to us any error on the part of the trial court. Absent an allegation of error, we are at a loss as to what relief plaintiff seeks in this court. The trial court decision will stand.

For all of the reasons set forth above, the judgment of the circuit court of Du Page County is affirmed in all respects.

Affirmed.

McLAREN and GEIGER, JJ., concur.