MARIAN ALVAREZ, Plaintiff-Appellant, v. AMERICAN ISUZU MOTORS, Defendant-Appellee.

First District (6th Division)   No. 1—00—0869

Opinion filed March 30, 2001.

Krohn & Moss, Ltd., of Chicago (Stephen R. Auten, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (Denean K. Sturino, Hugh S. Balsam, and Stevie A. Starnes, of counsel), for appellee.

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiff Marian Alvarez appeals from an order of the trial court setting aside a jury verdict in plaintiff's favor on her breach of implied warranty of merchantability claim against defendant American Isuzu Motors. Plaintiff argues on appeal that the trial court erred in granting defendant's motion for judgment notwithstanding the verdict. We affirm.

On June 13, 1996, plaintiff purchased a 1996 Isuzu Rodeo automobile from Schaumburg Isuzu, an authorized dealer of automobiles manufactured and exported to the United States by Isuzu Motors of America and distributed by defendant. The price of the Rodeo, including taxes and title charges, was $26,326.35. Defendant's new vehicle limited warranty, as stated in the warranty booklet accompanying the Rodeo, covered the car for 36 months or 50,000 miles, whichever came sooner, and warranted that the car would be free of defects

in materials and workmanship during the warranty period. Any Isuzu dealer would make the repairs necessary to correct defects covered by the warranty and the buyer should allow a reasonable time for such repairs to be made. The warranty specifically excluded coverage for defects or malfunctions occurring due to the buyer's misuse of the car or negligence in maintaining it. Additional warranties covered the "Power Train" and the exterior finish of the car. The Rodeo had approximately 200 miles on it when plaintiff bought the car.

Six weeks after the purchase, plaintiff began experiencing difficulties with the car. Thereafter followed a series of return visits to Schaumburg Isuzu for a myriad of problems. The litany of plaintiff's complaints and the concomitant repairs by Schaumburg Isuzu is as follows:

| Date | Problem(s) | Repair(s) |
|---|---|---|
| July 24, 1996 | Check Engine light on | Repaired oxygen sensor |
| | Antifreeze leak | Replaced radiator hose |
| August 29, 1996 | Scraping sound on right side of car | Repaired right front brake caliper; cleaned and lubed brake pads |
| November 11, 1996 | Radio inoperable | Radio functioned normally; no problem found |
| | Check Engine light on | Engine misfire caused light on; no problem found |
| | Oil change | Oil changed |
| January 22, 1997 | Transmission shifting prematurely and jerking (car had 9,000 miles) | Parts ordered: transmission inhibitor switch and radiator (current one was leaking) |
| January 27, 1997 | | Above parts installed |
| January 29, 1997 | Dome light inoperable | Door switch replaced (Exhaust studs replaced—unrelated to problem) |
| | Transmission shifting too soon | Transmission replaced |
| February 4, 1997 | Vehicle jerks while stopping and accelerating and bangs on up shift | Transmission gasket and band control solenoid replaced (Technician noted that transmission might need to be replaced ) |
| February 10, 1997 | Transmission shifting too early and slamming into gear when downshifting | Transmission replaced |
| February 12, 1997 | Transmission shifting hard and intermittently jerking | (While diagnosing problem, Rodeo out of service for 10 days; rental provided to plaintiff at no cost) |
| February 21, 1997 | (Car returned to plaintiff) | Mode select switch replaced[1] |

---

[1]Repair order states transmission was replaced but service manager testified at trial that this notation was an error.

| Date | Problem(s) | Repair(s) |
|---|---|---|
| March 4, 1997 | Steering wheel shakes at speeds over 40 miles per hour | Studs replaced and tires rotated |
| March 8, 1997 | Steering wheel shakes at speeds over 40 miles per hour | Studs replaced and tires balanced |
| February 24, 1998 | Steering wheel shakes | Technician recommended rotating tires |
| | Key sticking in ignition | Part ordered |
| March 10, 1998 | | Key problem repaired. |

On March 18, 1997, plaintiff filed a two-count complaint against defendant. That complaint and an amended complaint were dismissed. On July 14, 1997, plaintiff filed a three-count second amended complaint alleging (I) breach of written warranty under the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq.* (1994)); (II) breach of implied warranty of merchantability under the Magnuson-Moss Warranty Act (15 U.S.C. § 2301(7) (1994)); and (III) breach of implied warranty of merchantability under the Illinois Uniform Commercial Code (810 ILCS 5/2—314 (West 1992)). Plaintiff alleged that, as a result of ineffective repair attempts, the Rodeo could not be used as intended by her at the time of purchase and was unmerchantable, unsafe, and unfit for the ordinary and essential purpose for which such vehicles were intended and as represented by defendant. Plaintiff requested damages in the amount of the purchase price of the car and all collateral charges and attorney fees. Plaintiff later voluntarily withdrew count III. Following mandatory arbitration, the arbitrators found in favor of defendant and awarded no damages. Plaintiff rejected the award and the case went to trial on June 10, 1999.

At trial, plaintiff went through the repair orders issued for the car and testified to the numerous times that she had taken the Rodeo in for repairs. Plaintiff testified that the Rodeo never stalled and "died" on her. She verified that Schaumburg Isuzu provided her with rental cars at no charge while the Rodeo was being repaired, but that she had had to rearrange her schedule, take time off work and call family and friends for rides to and from the dealership due to the repairs. Plaintiff used the Rodeo to travel to and from work and for errands. She testified that she did not feel safe putting her young children in the car but that she had to use it to get to work. On February 15, 1997, plaintiff's attorney sent a letter to defendant revoking acceptance of the Rodeo, informing defendant that plaintiff would no longer make payments on the Rodeo and demanding cancellation of plaintiff's contract, the return of all funds expended by plaintiff towards purchase of the Rodeo, and compensation for her damages. Plaintiff testified that she "gave up" on the car after March 8, 1997,

and that she received no further service after that date. Suit was filed on March 18, 1997. Plaintiff testified that she continued driving the Rodeo until she traded it in to Schaumburg Isuzu 14 months later, in May 1998, on a leased 1998 Isuzu Trooper, after she had saved enough for the down payment. The lease invoice shows that the down payment on the Trooper was $948 and that plaintiff received a credit of approximately $15,000 for the Rodeo.

Plaintiff also presented the testimony of Mike Townsend, the service director for Schaumburg Isuzu. Townsend testified that Schaumburg Isuzu never declined to make any repair to the Rodeo and that it even performed services which were maintenance items and not covered by the warranties on the car, such as rotating the tires. Townsend testified that although the Isuzu warranty does not cover items caused by customer abuse, misuse or lack of maintenance, in order to foster good customer relations, Schaumburg Isuzu would often provide goodwill service to its customers and take care of non-covered complaints.

After the close of plaintiff's case, defendant moved for a directed verdict, arguing that plaintiff failed to present (a) expert testimony regarding the existence of a defect in the Rodeo and (b) evidence that the alleged defect was present when the Rodeo left the manufacturer. The court reserved ruling on the motion. The trial continued.

Defendant presented the testimony of Elliott Von Easmann. Von Easmann and his girlfriend had leased the Rodeo on May 23, 1998, two months after plaintiff traded the car in for the Trooper. Von Easmann testified that he was the principal driver of the Rodeo and that he had experienced no problems with the car in the 13 months that he had been driving it. Von Easmann went through the list of plaintiff's complaints and confirmed that he never had any of those problems. Von Easmann had put 7,000 miles on the car, had not had a single service repair in that time, and was very happy with the car.

Patrick Reynolds testified as defendant's expert. Reynolds, an electrical and mechanical engineer, was a product analysis manager for defendant. As such, he conducted investigations for defendant. Reynolds inspected the Rodeo on March 10, 1998, looking for the problems outlined in plaintiff's complaint. Reynolds performed a test drive and a visual inspection. He also used a computer diagnostic tool to monitor the three system computers in the Rodeo, transmission, engine and brakes, and found no problems in any of the systems at that time or within the last 1,000 start cycles, covering the past three to four months. Reynolds testified with a reasonable degree of mechanical and engineering certainty that the Rodeo had no defects at the time of inspection, had no impairment in value, and was safe to

operate. Further, Reynolds had reviewed the repair orders, technicians' notes, and warranty claim history and had determined that all the complaints had been fixed within a reasonable time.

Reynolds then went through the complaints for which plaintiff had brought the Rodeo in for repair. Reynolds testified that the dome light malfunctioned because plaintiff had had an alarm installed in the car. The alarm had not been installed by defendant or the dealer and was not compatible with the Rodeo's electrical system. The alarm would draw excessive voltage from the Rodeo's electrical system, thereby potentially causing problems such as stalling or malfunctioning dome, "check engine" or "check transmission" lights. Reynolds found no evidence of the transmission shifting too early or of leaks. Reynolds did feel some vibration in the steering wheel but stated that this was caused by a problem with the tires and the brakes. The tires were unevenly worn, which would result in the steering wheel shaking. The uneven wear was caused by their not having been rotated per the owner's maintenance schedule, which is not a warranty item. The brakes needed resurfacing, which was strictly an owner's maintenance item and was caused by the driver "riding the brake" or depressing the brake while also pressing the accelerator.

With regard to the transmission, Reynolds testified that the mode select switch had been the problem. In February 1998, after replacing the two transmissions had failed to remedy plaintiff's complaint, one of defendant's technicians came out to work with Schaumburg Isuzu's technicians in order to diagnose the car. Through use of a diagnostic computer, the technician determined that a voltage variance in the mode select switch was the cause of the transmission problem. The mode select switch is external to the transmission. Reynolds opined that there had been nothing wrong with the transmissions placed in the Rodeo. Rather, the problem had been in the external mode select switch, a problem which was difficult to diagnose because it was unusual. Reynolds stated that replacement of the switch had solved the problem and that 2½ weeks was a reasonable amount of time in which to fix the problem, given its unusual nature. Reynolds testified that the switch had not been defective when it left the manufacturer because it had functioned correctly for 9,000 miles. Moisture entry into the switch from rain, snow or road salts would be the most likely cause of the switch's malfunctioning. Reynolds noted that plaintiff had had no problems with the transmission until winter. Reynolds stated that "cars commonly have unusual problems. That doesn't make them defective."

Reynolds stated that the defect was not present when the Rodeo left the manufacturer or the dealer because the car functioned

normally when it left the manufacturer and for 9,000 miles thereafter. Further, the dealer had done a predelivery inspection and test drive of the Rodeo and had not recorded any problems with the car. Defendant had spent in excess of $10,000 in warranty claims repairing the Rodeo. Reynolds testified that this was not unusual.

After the close of evidence, defendant again moved for a directed verdict and the court again reserved ruling, preferring to wait until after the jury verdict. The jury found for defendant on the breach of written warranty claim but found for plaintiff on the breach of implied warranty claim. The jury awarded plaintiff $2,200 in damages. The court then granted defendant's motion for directed verdict on the breach of implied warranty claim, finding that plaintiff had failed to sustain her burden and *prima facie* case. The court denied plaintiff's posttrial motion to reconsider or, in the alternative, for a new trial. In its memorandum opinion and order on the posttrial motion, citing to *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 357 N.E.2d 449 (1976), the court stated that plaintiff "had failed to prove the absence of abnormal use or a reasonable secondary cause with respect to the problems plaintiff was experiencing with her vehicle's transmission and other claimed defects." Plaintiff timely appeals the judgment notwithstanding the verdict on the implied warranty count.

■ A court may enter a judgment notwithstanding the verdict only when the evidence, viewed in a light most favorable to the nonmoving party, so overwhelmingly favors the movant that a contrary verdict could not stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). A motion for a judgment notwithstanding the verdict presents "a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiff['s] case." *Merlo v. Public Service Co.*, 381 Ill. 300, 311, 45 N.E.2d 665, 672 (1942). We review the trial court's decision granting defendant's motion for judgment notwithstanding the verdict *de novo.. McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999).

■ ■ The Magnuson-Moss Warranty Act imposes on manufacturers the same implied warranties that state law imposes on the buyer's immediate seller. *Cosman v. Ford Motor Co.*, 285 Ill. App. 3d 250, 255, 674 N.E.2d 61, 64 (1996). Accordingly, pursuant to section 2—314(2)(c) of the Illinois Uniform Commercial Code, a product breaches the implied warranty of merchantability if it is not "fit for the ordinary purposes for which such goods are used." 810 ILCS 5/2—314(2)(c) (West 1992). In order to prove a breach of an implied warranty of

merchantability, plaintiff must prove that the Rodeo was defective and that the defect(s) existed when the car left defendant's control. *Cosman*, 285 Ill. App. 3d at 257, 674 N.E.2d at 66. Plaintiff is not required to prove a specific defect. *Erzrumly v. Dominick's Finer Foods, Inc.*, 50 Ill. App. 3d 359, 363, 365 N.E.2d 684, 687 (1977). Rather, pursuant to *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 357 N.E.2d 449 (1976), a defect may be proven inferentially by direct or circumstantial evidence. *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 377, 618 N.E.2d 909, 915-16 (1993); see *Tweedy*, 64 Ill. 2d 570, 357 N.E.2d 449.[2] *Tweedy* states:

> "A *prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed 'to perform in the manner reasonably to be expected in light of [its] nature and intended function.' [Citations.]" *Tweedy*, 64 Ill. 2d at 574, 357 N.E.2d at 452.

In *Tweedy*, the plaintiff suffered injuries when his car's brakes failed and the car crashed into a tree. Although the plaintiff presented no expert testimony regarding the presence of a specific defect in the car's brake system and the defendant presented expert testimony regarding the absence of a malfunction, the court determined that the evidence showed that the brakes failed during normal use. The court stated that the evidence showed that "the brakes of an automobile driven approximately 7,500 miles, inspected by [the dealer] prior to delivery, inspected again at 6,000 miles, and subjected to no abnormal use prior to the occurrence failed to function in the manner reasonably to be expected." *Tweedy*, 64 Ill. 2d at 574, 357 N.E.2d at 452. The plaintiff had been driving at a reasonable rate of speed and knew the intersection well where the accident occurred, the weather was good, the roads were dry, and there was no evidence of any reasonable secondary cause. The court found that plaintiff had sustained her *prima facie* case. " '[R]easonable inferences may be drawn from established facts and all that can be reasonably required to establish controverted facts, whether the evidence be direct or circumstantial, is that the evidence creates a greater or less probability leading, on the whole, to a

---

[2]Although *Tweedy* concerns a strict liability case, the decision is applicable in breach of implied warranty of merchantability cases. The theories of breach of implied warranty of merchantability and strict liability are nearly identical. *State Farm Fire & Casualty Co. v. Miller Electric Co.*, 204 Ill. App. 3d 52, 61, 562 N.E.2d 589, 595 (1990). "[T]he existence of a defect in a product is a necessary requirement to prevail under either theory" and that defect must have existed when the product left the manufacturer's possession. *State Farm Fire & Casualty Co.*, 204 Ill. App. 3d at 61-62, 562 N.E.2d at 595-96.

satisfactory conclusion.' " *Tweedy*, 64 Ill. 2d at 575, 357 N.E.2d at 452, quoting *Lindroth v. Walgreen Co.*, 407 Ill. 121, 134, 94 N.E.2d 847, 853 (1950).

Following *Tweedy*, the court in *Doyle* stated that "in order to establish that a product was unreasonably dangerous under his *'Tweedy* count,' wherein no specific defect in the product was alleged, plaintiff was required to prove also that he did not use the product in an unreasonable manner and that no reasonable secondary causes of his injury existed." *Doyle*, 249 Ill. App. 3d at 379, 618 N.E.2d at 917. Similarly, in *Erzrumly*, the court stated that a plaintiff "may prove her case inferentially by establishing that the product malfunctioned and by excluding other reasonable causes of the malfunction." *Erzrumly*, 50 Ill. App. 3d at 363, 365 N.E.2d at 687.

■ Plaintiff has not shown that the Rodeo was unfit for the purpose for which it was intended. Plaintiff has failed to prove, through either direct or circumstantial evidence, that the Rodeo was defective or that the alleged defect existed at the time of purchase. With no expert testimony regarding the defects, plaintiff must present evidence of absence of abnormal use of the Rodeo and exclude any possible secondary causes of the alleged defects. Our review of the record shows that she has failed to do so.

■ "[P]roof of a malfunction during normal use which tends to exclude other extrinsic causes is sufficient to make a *prima facie* case on the issue of the existence of a defective condition." *Johnson v. Amerco, Inc.*, 87 Ill. App. 3d 827, 830, 409 N.E.2d 299, 303 (1980), citing *Bollmeier v. Ford Motor Co.*, 130 Ill. App. 2d 844, 851, 265 N.E.2d 212, 217 (1970). Such a malfunction need not manifest immediately upon purchase of the product. Rather, "[e]vidence of reasonable and proper handling of a product between the time it left the possession and control of the defendant manufacturer or seller and the time of the occurrence of the injury is an indication that the defect alleged to have existed at the time of the injury did not come into being in the interim, but existed prior thereto." *Fullreide v. Midstates Beverage Co.*, 70 Ill. App. 3d 758, 762, 388 N.E.2d 1070, 1073 (1979). There is no evidence of proper handling here. Unlike the plaintiff in *Tweedy*, plaintiff did not present evidence that she used the car normally. All plaintiff testified to was that she used the car to travel to work and to run errands. There is no evidence of plaintiff's handling and care of the Rodeo at all, under what conditions she drove the car, or how she maintained it.

■ Plaintiff asserts that "because the repairs are direct evidence of the unmerchantable nature of the Rodeo," the repair history negates plaintiff's burden under *Tweedy*. We disagree. Although there

is no denying that plaintiff suffered some inconvenience with the Rodeo, there has been no evidence presented that the car was unmerchantable and not fit for the purpose for which it was intended. All we have from plaintiff is a recitation of the times that she took the car in for repair for a series of minor deficiencies, all of which were remedied. In her own testimony, plaintiff stated that the Rodeo never stalled or died. Plaintiff was able to use the car to go to work and run her errands. Unlike cases wherein courts found a defect through circumstantial evidence, plaintiff's alleged defects were minor and did not affect the fitness of the product. See *Tweedy*, 64 Ill. 2d 570, 357 N.E.2d 449 (plaintiff injured when car brakes failed; plaintiff presented evidence of normal use: reasonable rate of speed, familiarity with the road, good weather, road dry, inspected prior to delivery; no evidence of reasonable secondary cause); *Gillespie v. R.D. Werner Co.*, 71 Ill. 2d 318, 375 N.E.2d 1294 (1978) (plaintiff injured when ladder collapsed; plaintiff presented evidence of normal use: floor level, ladder inspected prior to use, plaintiff did not lean over or unbalance); *Bollmeier*, 130 Ill. App. 2d 844, 265 N.E.2d 212 (plaintiff's son injured when car steering failed; plaintiff presented evidence of normal use: son was driving at normal rate of speed, son had not had alcoholic drink and there was evidence of prior related malfunction immediately after delivery of vehicle). In those cases, the product was clearly unfit for its intended purpose and the plaintiff was injured as a result.

More similar to the case at bar is *Tokar v. Crestwood Imports, Inc.*, 177 Ill. App. 3d 422, 532 N.E.2d 382 (1988), wherein the court found that the plaintiff's evidence that he brought his car into his dealer complaining of a grinding noise in the transmission was insufficient to create a *prima facie* case of breach of either an express warranty to repair or an implied warranty of merchantability. The plaintiff's evidence, including his expert's testimony wherein the expert noted that he had examined the engine and repair orders for the car but not the transmission, failed to establish that the cause of the grinding noise was a defect in the car which the manufacturer failed to remedy "or which rendered the car unfit for the ordinary purpose for which autos are used." *Tokar*, 177 Ill. App. 3d at 436, 532 N.E.2d at 391.

Plaintiff concedes that "the repairs[,] standing alone, do not prove that the Rodeo was unmerchantable" and that she needed to prove that the repairs were necessitated by defects attributable to defendant. Plaintiff argues that she proved this through defendant's warranty booklet and the Rodeo's warranty claim history. The warranty specifically excluded repairs caused by a vehicle owner's abuse, negligence or modification of the vehicle. Plaintiff argues that, because defendant did not refuse to make any of the repairs to the Rodeo, "a

logical inference—and one that supports the jury's verdict—is that if the repairs were covered under the warranty, the repairs were necessitated by defects attributable to [defendant]" and that any repairs were done to correct defects in defendant's materials or workmanship. This argument is directly refuted by the testimony of plaintiff's own witness, Schaumburg Isuzu service manager Townsend, who testified that service was routinely provided for nonwarranty items as a gesture of Isuzu's goodwill towards its customers.

Arguably, most of defendant's expert Reynolds' opinions regarding possible secondary causes of the problems were only applicable to the time at which he inspected the car, rather than to the period during which plaintiff was experiencing the problems. However, as noted above, most of the problems (dome light, engine light, leak, radio, scraping sound) were minor and can in no way be considered defects affecting the fitness of the car. Any possible secondary causes for those problems were moot since they cannot be considered defects affecting the fitness of the Rodeo. The only defect of any consequence, the jerking of the transmission, was remedied after replacement of the mode select switch. Reynolds clearly stated that this problem was due to the buildup of moisture and road salts on the switch during the winter in which plaintiff drove her car and not due to a manufacturing defect. In order for plaintiff to prevail, she should have excluded the buildup of moisture or other materials as a reasonable possible cause of the problem. "Although plaintiff need not disprove every alternative cause of her injury [citation], liability may not be based on mere possibility [citation]. The test to be applied is whether the circumstances shown were such as to justify an inference of probability as distinguished from mere possibility." *Erzrumly*, 50 Ill. App. 3d at 363, 365 N.E.2d at 687. "[A] jury may not engage in mere speculation and conjecture." *Rockett v. Chevrolet Motor Division, General Motors Corp.*, 31 Ill. App. 3d 217, 222, 334 N.E.2d 764, 769 (1975). Plaintiff presented no evidence that the transmission problem already existed at the time of sale. With defendant's evidence to the contrary before it, it would have been mere conjecture for the jury to conclude that the defect existed when the Rodeo left the defendant's control. Therefore, the court did not err in setting aside the jury verdict.

For the reasons stated above, we affirm.

Affirmed.

CAMPBELL, P.J., and O'BRIEN, J., concur.