SHANTE RAZOR, Plaintiff-Appellee, v. HYUNDAI MOTOR AMERICA, Defendant-Appellant.

First District (3rd Division)    No. 1—03—1359

Opinion filed June 16, 2004.

---

652

Segal, McCambridge, Singer & Mahoney, Ltd., of Chicago (Paul E. Wojcicki and E. Brooke Harkrader, of counsel), for appellant.

Krohn & Moss, Ltd., of Chicago (Scott M. Cohen, of counsel), for appellee.

JUSTICE KARNEZIS delivered the opinion of the court.

Plaintiff Shante Razor brought an action pursuant to the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (15 U.S.C. § 2301 *et seq.* (1994)) (Magnuson-Moss Act) and the Illinois New Vehicle Buyer Protection Act (815 ILCS 380/1 *et seq.* (West 2002)) seeking damages from defendant Hyundai Motor America for defendant's breach of its written warranty and implied warranty of merchantability on the new car it sold to plaintiff. The trial court entered judgment on a jury verdict in favor of plaintiff, awarding her actual and consequential damages.

Defendant argues on appeal that the court erred in failing to grant defendant's motion for judgment notwithstanding the verdict (judgment *n.o.v.*), failing to reverse the jury's award of consequential damages, and awarding plaintiff attorney fees and costs. Defendant asserts that (1) plaintiff failed to prove damages, an essential element of her *prima facie* case; (2) plaintiff did not have a claim for breach of implied warranty under the Magnuson-Moss Act because there was no privity between plaintiff and defendant; (3) plaintiff had no claim for breach of limited warranty or implied warranty of merchantability because she failed to prove that an alarm/remote starter system not covered under defendant's limited warranty was not the cause of the car's problems; and (4) consequential damages should not have been awarded because defendant's limited warranty disclaimed liability for incidental and consequential damages. Defendant also asserts that, in the event this court reverses the trial court's judgment, the judgment awarding fees and costs must be reversed. We affirm.

## Background

On August 4, 2001, plaintiff purchased and took delivery of a new 2001 Hyundai Sonata GLS. She purchased the car from Gartner Buick, Inc. (Gartner), in Aurora, Illinois. It was manufactured and distributed by defendant. Defendant's new vehicle limited warranty covered the car for 60 months or 60,000 miles, whichever came sooner. The warranty provided the following coverage for the duration of the warranty:

> "Repair or replacement of any component originally manufactured or installed by Hyundai Motor Company or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance, except any item specifically referred to in the section 'What is Not Covered.' "

The warranty stated that, "[i]n certain unique circumstances, Hyundai may decide, as a matter of goodwill, to pay for service or an item not normally covered by warranty." The owner's manual for the car warned that the car "should not be modified in any way" because

"[s]uch modifications may *** violate conditions of the limited warranties covering the vehicle."

The "What is Not Covered" section of the warranty excluded coverage for damage or failure resulting from, among other things:

> "— Negligence of proper maintenance as required in the Owner's Manual.
>
> — Misuse, abuse, accident, theft, water/flooding or fire.
>
> — Use of improper or insufficient fuel, fluids or lubricants.
>
> — Use of parts other than Hyundai genuine parts, or parts of non-equivalent quality and design.
>
> — Any device or accessories not supplied by Hyundai.
>
> — Modifications, alterations, tampering or improper repair.
>
> — Parts or accessories used in applications for which they were not designed or not approved by HMA."

The "What is not Covered" section also stated "incidental or consequential damages, including without limitation, loss of time, inconvenience, loss of use of the vehicle or commercial loss."

Approximately one month after purchasing the car, plaintiff experienced problems starting it. She took it to Gartner for repair five times for the same problem.

On January 7, 2002, plaintiff filed a four-count complaint against defendant alleging that, "as a result of ineffective repair attempts by [defendant], through its authorized dealership network, the Sonata cannot be utilized for personal, family and household use as intended by Plaintiff at the time of acquisition." She stated that the car had been taken for repair of the same defect at least five times but that the defect remained uncorrected. Plaintiff asserted claims for (I) breach of written warranty under the Magnuson-Moss Act; (II) breach of implied warranty under the Magnuson-Moss Act; (III) revocation of acceptance under the Magnuson-Moss Act; and (IV) violation of the Illinois New Vehicle Buyer Protection Act. Following an arbitration finding and award in favor of plaintiff, defendant rejected the award and the case proceeded to trial.

Plaintiff testified at trial that the Sonata was her first new car and that she bought it because she had heard good things about the car, she needed dependable transportation to get to and from work and "every place else" and the price was reasonable. When plaintiff bought the car, the salesman showed her a binder of options and features that could be installed in the car. Plaintiff elected to have a Professional Sound Installers, Inc. (ProSound), alarm/remote starter system installed in the car. The price of the system was included in the purchase price of the car.

Plaintiff took her new car home on August 4, 2001, but returned

it to Gartner on August 30, 2001, to have the remote starter system installed. The odometer on the car read 1,944 miles. Gartner subcontracted the installation to ProSound and plaintiff got the car back the same day. Plaintiff did not know until she saw the work order for the installation that the system was made and installed by ProSound rather than Hyundai.

On September 26, 2001, when plaintiff attempted to start the car with her key, the car did not crank. She checked multiple things to make sure that she was not the cause of the failure to start, such as whether the gear shift was engaged, but could find no reason for the problem. She called roadside assistance and had the car towed to Gartner. The odometer on the car read 3,518 miles. Gartner's work order shows that when Gartner service technicians checked the car it started every time and they found no problems with the battery, cables and connections. Plaintiff received the car back that afternoon but missed a day of work as a result of having to take the car for repair.

On October 6, 2001, plaintiff brought the car into Gartner again, complaining that the car would not start when cold. The odometer on the car read 3,931 miles. Gartner checked the car and it started. Technicians found the starter was intermittently open and replaced it. They also performed an oil change free of charge. Gartner provided plaintiff with a loaner car during the two days her car was being serviced.

On October 16, 2001, plaintiff had the car towed to Gartner again, complaining that the car would "not crank sometimes." The repair order shows that technicians replaced a shorted "ECU power relay" but does not state that it was the cause of the problem. Gartner had the car for three days.

On October 25, 2001, plaintiff again brought the car in complaining that it would not start. The repair order states that technicians let the car "sit overnight several times" and that it started in the morning. Gartner had ProSound remove the alarm/remote starter system and then again let the car sit overnight several times. The car started each time. ProSound then installed an updated remote system. The car continued to start when tested. Gartner had the car until November 12, 2001, and provided plaintiff with a rental car during the repair period.

On November 21, 2001, plaintiff again was unable to start the car. She testified that Gartner sent a technician to her home and that he was also unable to start the car. The technician had the car towed to Gartner and gave plaintiff his loaner car to use. At Gartner, technicians were unable to verify the no-start condition because the car started each time they tested it. They checked the car's wiring, con-

nectors and ignition switch and replaced the starter relay and trans range switch. The car was returned to plaintiff on December 7, 2001.

Since December 7, 2001, plaintiff experienced no further problems with the car and, at the time of trial, continued to own and operate the car. She testified that her confidence in the car had been significantly restored, she used it to make a 60-mile round trip to work five days a week and a 44-mile round trip to church on weekends and had driven it over 20,000 miles.

Plaintiff stated that she had never been in an accident with the car; it had never been vandalized, raced or flooded; she performed the required maintenance; and no one other than Gartner and its subcontractor, ProSound, had ever performed repairs on the car. Plaintiff testified that, having previously owned a used car, the Sonata did not provide her with the type of transportation she expected from "a brand new car." She expected it to be "perfect, flawless or minimal problems, certainly not the ones that I encountered here." Plaintiff would not purchase the car "today" because it had proven unreliable. She would not pay the price she paid because the problems she had with the new Sonata were akin to those she had with her previous car, which had been used and from which she had expected some problems. Plaintiff testified that "I would not pay that for a new car with used problems as it were." Plaintiff had not been charged for any of the repair work on the car or the cost of the loaner cars.

When plaintiff got the car back in November 2001 after having been without it for two weeks, she thought it was fixed. When she turned the key in the ignition on November 21 and nothing happened again, she "just broke down" and a Gartner service manager's statement to her that it must be something plaintiff was doing to cause the no-start problem "just aggravated the whole situation." Plaintiff stated that besides the aggravation, she was inconvenienced as a result of the car's problems because she missed work, was late for work, had to depend on other people when she did not have a loaner car, and had to wait for tows.

Plaintiff was the sole witness in her case. The court denied defendant's motion for a directed verdict and defendant called its only witness, Randall Wood, part-owner and treasurer of ProSound.

Wood testified that he had previously installed starter systems but did not personally work on plaintiff's car. He knew ProSound installed an alarm/remote starter system in the car and that plaintiff subsequently had problems starting the car. Wood stated that the original remote system in plaintiff's car included an anti-grind relay which prevented the car from starting if the ignition key was turned when the car had been locked with the remote control. When ProSound

reinstalled the remote system in plaintiff's car, Wood instructed his installer to eliminate the anti-grind relay in order to eliminate the possibility that the car's failure to start was due to ProSound's installation. On reinstallation, Wood also had the tachometer wire, which monitors the car's engine and signals the remote to release the starter when the engine starts running, moved to a different location in the car in case it was unreliable and the cause of the failure to start. Wood also testified that the remote system might have a passive arming feature whereby, under certain conditions, the system would automatically rearm itself after 45 seconds and thereby prevent the car from starting.

At the close of evidence, the court denied defendant's motion for a directed verdict. The jury found in favor of plaintiff on the breach of written warranty and breach of implied warranty of merchantability counts, and awarded plaintiff $5,000 as breach of warranty damages, $3,000 for aggravation and inconvenience and $500 for loss of use. The jury found in favor of defendant on plaintiff's claim for breach of the Illinois New Vehicle Buyer Protection Act. Plaintiff abandoned her revocation of acceptance claim. The jury answered "yes" to a special interrogatory asking "Did plaintiff prove the aftermarket remote starter-alarm system was not the cause of the no-start condition?"

The court entered judgment for plaintiff on the jury verdict and denied defendant's postrial motion for judgment *n.o.v.* or, in the alternative, to vacate the consequential damage award. The court granted plaintiff's petition for fees and costs, awarding her $12,277 in addition to the $8,500 damage award. Defendant timely appeals.

## Analysis

### Standard of Review

■ A court may enter a judgment *n.o.v.* only when, viewing the evidence in a light most favorable to the nonmoving party, it so overwhelmingly favors the movant that a contrary verdict could not stand. *Alvarez v. American Isuzu Motors*, 321 Ill. App. 3d 696, 702, 749 N.E.2d 16, 22 (2001), citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). A defendant's motion for judgment *n.o.v.* presents " 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiff['s] case.' " *Alvarez*, 321 Ill. App. 3d at 702, 749 N.E.2d at 22, quoting *Merlo v. Public Service Co.*, 381 Ill. 300, 311, 45 N.E.2d 665, 672 (1942). We review *de novo* the trial court's decision denying defendant's motion for judgment *n.o.v. Alvarez*, 321 Ill. App. 3d at

702, 749 N.E.2d at 2, citing *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999).

## Failure to Prove Damages

■ Defendant first argues that the judgment must be reversed because plaintiff failed to prove damages, an essential element of her *prima facie* case for breach of warranty. Plaintiff filed her action for breach of warranties pursuant to the Magnuson-Moss Act, which provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1) (1994). By implication, because the Magnuson-Moss Act does not address damages for breach of limited and implied warranties, the Uniform Commercial Code (UCC) (810 ILCS 5/1 *et seq.* (West 2002)) is used for such determinations. *Lara v. Hyundai Motor America*, 331 Ill. App. 3d 53, 61, 770 N.E.2d 721, 727 (2002).

Section 2—714 of the UCC provides that "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." 810 ILCS 5/2—714(2) (West 2000). The UCC also provides for incidental and consequential damages in proper cases. 810 ILCS 5/2—714(3) (West 2000). The special circumstances exception to section 2—714(2) must be read in conjunction with section 1—106 of the UCC (810 ILCS 5/1—106(1) (West 2000)), which provides that remedies found in the UCC "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." *Dynamic Recycling Services, Inc. v. Shred Pax Corp.*, 210 Ill. App. 3d 602, 615, 569 N.E.2d 570, 578 (1991).

Plaintiff presented evidence of the purchase price of the car, the car's chronic failure to start, the number of times the car was taken for repair and the amount of time she was without the car. She testified that the value of the car she received (a vehicle that intermittently failed to start) was less than the value of the car she thought she was buying (a new car with no such problems, *i.e.*, a car that was capable of starting and being driven on demand). She testified that, if she had known at the time of purchase what she knew at trial, she would not have bought the car and would certainly not have paid the price she paid for a "new car with used problems." She testified that she missed work and that she and her family suffered inconvenience

and aggravation as a result of the car's failure to start. The jury found for plaintiff and awarded her damages for breach of the limited and implied warranties, loss of use and for aggravation and inconvenience damages.

■ Mathematical precision is not required in proof of loss, especially in the determination of consequential damages. *McGrady v. Chrysler Motors Corp.*, 46 Ill. App. 3d 136, 139-40, 360 N.E.2d 818, 821 (1977). Rather, the amount of damages is determined by the trier of fact in the exercise of sound discretion and in any manner reasonable under the circumstances, as long as the award is not punitive. *McGrady*, 46 Ill. App. 3d at 139-40, 360 N.E.2d at 821. "Where the right to recovery exists[,] the defendant cannot escape liability because the damages are difficult to prove." *Burrus v. Itek Corp.*, 46 Ill. App. 3d 350, 357, 360 N.E.2d 1168, 1172 (1977). Here, the court properly instructed the jury that plaintiff had to prove that she sustained damages as a proximate cause of defendant's breach and that the jury need not be mathematically precise in its damages determination and could use a "reasonable basis for damages." Based on its own experience and plaintiff's testimony, the jury could reasonably determine the difference between the value of the car as promised (a problem-free, reliable car capable of being driven at will) and the value of the car as plaintiff actually received it (an unreliable car, prone to not starting and, on such occasions, incapable of being driven), as well as incidental and consequential damages. We do not find "a total failure or lack of evidence to prove" the damages element necessary to the plaintiff's case such that judgment *n.o.v.* was warranted.

## Lack of Privity

■ Defendant argues that plaintiff cannot state a claim for breach of implied warranty under the Magnuson-Moss Act because there is no privity between plaintiff and defendant. We recently considered and rejected this argument in *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828 (2004), and can summarily dispose of this issue.

The Magnuson-Moss Act provides that actions for breach of an implied warranty of merchantability may arise only under state law. 15 U.S.C. § 2301(7) (1994); *Mekertichian*, 347 Ill. App. 3d at 831. Illinois state law regarding actions for breach of an implied warranty of merchantability is stated in section 2—314 of the UCC (810 ILCS 5/2—314 (West 2002)). A plaintiff must be in vertical privity of contract with the seller in order to file a claim for economic damages for breach of implied warranty under the UCC. *Mekertichian*, 347 Ill. App. 3d at 832, citing *Szajna v. General Motors Corp.*, 115 Ill. 2d 294, 311, 503

N.E.2d 760, 767 (1986), and *Rothe v. Maloney Cadillac, Inc.*, 119 Ill. 2d 288, 292, 518 N.E.2d 1028, 1029-30 (1988). Pursuant to the UCC, a buyer of goods seeking purely economic damages for a breach of implied warranty has " 'a potential cause of action only against his immediate seller.' " *Mekertichian*, 347 Ill. App. 3d at 832, quoting *Rothe*, 119 Ill. 2d at 292, 518 N.E.2d at 1029. Therefore, pursuant to the UCC, plaintiff would only have a cause of action against Gartner and not against defendant.

However, in actions where (1) a consumer filed against a manufacturer pursuant to the Magnuson-Moss Act and (2) the manufacturer had expressly warranted a product to the consumer, the privity requirement has been relaxed. *Mekertichian*, 347 Ill. App. 3d at 832, citing *Szajna*, 115 Ill. 2d at 315-16, 503 N.E.2d at 769, and *Rothe*, 119 Ill. 2d at 294-95, 518 N.E.2d at 1030. In such cases, "vertical privity will be deemed to exist with respect to that consumer, enabling him to file an action for breach of implied warranty [against the manufacturer] as well." *Mekertichian*, 347 Ill. App. 3d at 832 (manufacturer held in vertical privity with consumer where manufacturer provided limited written warranty with new automobile; pursuant to doctrine of *stare decisis*, Illinois Supreme Court decisions regarding state privity requirements under the Magnuson-Moss Act are binding on all Illinois courts where United States Supreme Court has not addressed the issue), following *Szajna*, 115 Ill. 2d at 315, 503 N.E.2d at 769, and *Rothe*, 119 Ill. 2d at 294-95, 518 N.E.2d at 1030-31. Accordingly, because defendant provided a written limited warranty with the Sonata, it is deemed to be in vertical privity with plaintiff such that plaintiff has a cause of action for breach of implied warranty under the Magnuson-Moss Act.

## Breach of Limited Warranty

■ Defendant argues that plaintiff failed to prove that defendant breached its limited warranty to repair and replace defective parts. Although the Magnuson-Moss Act requires a warrantor to specify whether a written warranty is a full or limited warranty (15 U.S.C. § 2303(a) (1994)), the Act only sets out minimum standards for full warranties (15 U.S.C. § 2304 (1994)). *Pearson v. Daimler-Chrysler Corp.*, 349 Ill. App. 3d 688, 693-94 (2004), citing *Bartow v. Ford Motor Co.*, 342 Ill. App. 3d 480, 794 N.E.2d 1027 (2003), *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 722 N.E.2d 227 (1999), and *Lara*, 331 Ill. App. 3d at 62. Limited warranties are, therefore, not governed by the Magnuson-Moss Act but by the UCC. *Pearson*, 349 Ill. App. 3d at 693-94.

Pursuant to section 2—719(2) of the UCC, " '[w]here circum-

stances cause an exclusive or limited remedy [such as repair or replacement] to fail of its essential purpose, remedy may be had as provided in this Act.' " *Pearson*, 349 Ill. App. 3d at 694, quoting 810 ILCS 5/2—719(2) (West 2000). "The cases interpreting section 2—719(2) contemplate and impose a reasonableness standard" in determining whether a limited remedy failed of its essential purpose. *Pearson*, 349 Ill. App. 3d at 694. "A manufacturer does not have an unlimited time or an unlimited number of attempts to repair an automobile; rather, the limited warranty is breached and/or fails of its essential purpose if successful repairs are not made within a reasonable time or within a reasonable number of attempts." *Pearson*, 349 Ill. App. 3d at 695; see generally *Lara*, 331 Ill. App. 3d at 62, 770 N.E.2d at 728-29 ("A remedy limitation fails of its essential purpose when a seller unreasonably delays the replacement of the product, refuses to replace it at all, or is unsuccessful in correcting the defects 'within a reasonable time' "), quoting *Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.*, 315 Ill. App. 3d 248, 257-58, 733 N.E.2d 718 (2000); *Nowalski v. Ford Motor Co.*, 335 Ill. App. 3d 625, 628 n.3, 781 N.E.2d 578, 581 n.3 (2002) (follows *Lara*; where a limited warranty is at issue, court must rely on UCC cases "holding the seller must correct the defects 'within a reasonable time' "); *Adams v. J.I. Case Co.*, 125 Ill. App. 2d 388, 403, 261 N.E.2d 1 (1970) (failure of exclusive remedy provided in warranty to repair and replace defective parts "readily found in the allegation that defendants were wilfully dilatory or careless and negligent in complying with their obligations under the warranty").

■ In order to prove that defendant breached its written limited warranty on the Sonata, plaintiff had to prove:

"(1) the existence of a defect in the automobile covered by the warranty; (2) compliance with the terms of the warranty by plaintiff; (3) plaintiff afforded defendant a reasonable opportunity to repair the defect; and (4) defendant was unable to repair the defect after a reasonable time or a reasonable number of attempts." *Pearson*, slip op. at 12.

The jury determined that plaintiff proved her case and we find some evidence to support this determination.

It is clear that a defect existed in the car given that the ordinary purpose for which a car would be used, *i.e.*, as a mode of transportation, would necessarily entail being able to start the car so that it can be driven. Although defendant argues that Gartner did not verify that the car would not start, the jury found plaintiff's testimony that the car would not start credible. Credibility of witnesses is for the trier of fact to determine. *Omni Partners v. Down*, 246 Ill. App. 3d 57, 64, 614 N.E.2d 1342, 1347 (1993). Moreover, given the unlikelihood that

plaintiff would inflict on herself, her family and her employer the inconvenience and aggravation caused by having to take the car for repair numerous times without good reason, the jury's determination was reasonable.

The evidence supports the jury's apparent determination that plaintiff complied with the terms of the warranty. The warranty excludes coverage for damage or failure resulting from plaintiff's negligence of proper maintenance as required in the owner's manual. The manual prescribes that the first maintenance, an oil change, be performed after 6 months or 7,500 miles. The October 6 work order and plaintiff's testimony show that Gartner performed an oil change on the car two months after purchase and after plaintiff had driven the car almost 4,000 miles, well prior to the required maintenance interval. Although the maintenance interval prescribed for vehicles "normally used under severe driving conditions" is 3 months/3,000 miles, it was not argued or shown that plaintiff drove the Sonata under such conditions and the shorter maintenance interval is inapplicable here.[1]

Coverage is also excluded for damage or failure resulting from

"— Misuse, abuse, accident, theft, water/flooding or fire.
— Use of improper or insufficient fuel, fluids or lubricants.
— Use of parts other than Hyundai genuine parts, or parts of non-equivalent quality and design.
— Any device or accessories not supplied by Hyundai.
— Modifications, alterations, tampering or improper repair.
— Parts or accessories used in applications for which they were not designed or not approved by HMA."

Plaintiff testified that she used the car to drive to work, church and run errands, which are all normal uses for a car; she had never been in an accident with the car; and that the car had never been vandalized, raced, off-roaded or flooded. This testimony negates "[m]isuse, abuse, accident, theft, water/flooding or fire" as possible causes of the defect. There was no evidence that plaintiff failed to use proper or sufficient fuel, fluids or lubricants or genuine Hyundai parts or used parts and accessories in nonapproved ways or that such were the cause of the car's defect. The oil change and plaintiff's testimony that she tendered the car for repair only to Gartner, Hyundai's approved dealer, leads to the inference any repairs were properly performed by

---

[1] "Severe driving conditions" include repeated short distance driving, extensive idling, driving in dusty rough roads, towing a trailer, driving in very cold weather, and more than 50% driving in heavy city traffic during hot weather above 90°F.

Hyundai-approved personnel in Hyundai-approved applications with Hyundai-approved fluids, parts and materials.

There was also no evidence that the remote starter system, clearly a "device or accessor[y] not supplied by Hyundai" and a "modification, alteration" to the car, was the cause of the car's failure to start. The jury specifically found that plaintiff proved that "the aftermarket remote starter-alarm system was not the cause of the no-start condition." There is some evidence to support this determination given that (a) the car did not exhibit the problem until plaintiff had driven 1,574 miles and 26 days with the starter system in place; (b) the car failed to start even after the system had been removed and replaced with an updated system; and (c) the problem with the car was not fully resolved until after Gartner replaced the starter relay and trans range switch in December, neither of which is apparently related to the remote starter system. The jury reasonably could conclude that plaintiff complied with the terms of the warranty.

Plaintiff was not required to prove the specific cause of the failure to start, only that the defect existed in materials or parts covered by the warranty, those originally manufactured or installed by Hyundai, and that there was no secondary cause for the defect. The above evidence that the problem continued after replacement of the remote starter and was not remedied until after replacement of the starter relay and trans range switch also supports the jury's apparent conclusion that the defect existed in the original parts.

It is uncontested that plaintiff tendered the Sonata for repair to Gartner within the period covered by defendant's limited warranty and gave Gartner ample opportunity to repair the vehicle.

The Sonata's defect, its failure to start, appeared to be repaired at the time of trial. However, the question remained whether it was repaired within a reasonable time or reasonable number of attempts. The jury found that defendant breached its limited warranty, necessarily finding that five repair attempts within four months of purchase, which resulted in plaintiff's being without her car and/or having to use a loaner car for approximately 39 days within that four-month time period, was unreasonable. Reasonableness is for the jury to determine. *Pearson*, 349 Ill. App. 3d at 696.

Given that there is evidence to sustain each necessary element of the plaintiff's action for breach of limited warranty, the trial court was correct in denying defendant's motion for judgment *n.o.v.* on this count.

### Breach of Implied Warranty of Merchantability

■ Defendant also argues that plaintiff failed to prove breach of

the implied warranty of merchantability. As previously stated, where, as here, the manufacturer expressly warrants a product to a consumer, the Magnuson-Moss Act imposes on manufacturers the same implied warranties that state law imposes on the buyer's immediate seller. *Mekertichian*, 347 Ill. App. 3d at 831-32; see also *Cosman v. Ford Motor Co.*, 285 Ill. App. 3d 250, 255, 674 N.E.2d 61, 64 (1996), citing *Rothe*, 119 Ill. 2d 288, 518 N.E.2d 1028. State law, section 2—314(2)(c) of the UCC, provides that a product breaches an implied warranty of merchantability if it is not "fit for the ordinary purposes for which such goods are used." 810 ILCS 5/2—314(2)(c) (West 2000); *Alvarez*, 321 Ill. App. 3d at 702, 749 N.E.2d at 22. "With regard to automobiles, '[f]itness for the ordinary purpose of driving implies that the vehicle should be in a safe condition and substantially free of defects.' " *Lipinski v. Martin J. Kelly Oldsmobile, Inc.*, 325 Ill. App. 3d 1139, 1149, 759 N.E.2d 66, 74 (2001), quoting *Overland Bond & Investment Corp. v. Howard*, 9 Ill. App. 3d 348, 354, 292 N.E.2d 168, 172-73 (1972). Pursuant to section 2—725(2) of the UCC, an implied warranty of merchantability applies to the condition of the goods at the time of sale, not to their future performance. *Cosman*, 285 Ill. App. 3d at 257, 674 N.E.2d at 66; 810 ILCS 5/2—725(2) (West 2000).

In order to prove breach of an implied warranty of merchantability, plaintiff must prove that the Sonata was defective and that the defect(s) existed when the car left defendant's control. *Alvarez*, 321 Ill. App. 3d at 702-03, 749 N.E.2d at 22, citing *Cosman*, 285 Ill. App. 3d at 257, 674 N.E.2d at 66. Whether the defect existed at the time of delivery is for the trier of fact to determine. *Lipinski*, 325 Ill. App. 3d at 1151, 759 N.E.2d at 75.

Proof of a specific defect is not required. *Alvarez*, 321 Ill. App. 3d at 703, 749 N.E.2d at 22. Rather, a defect may be proven inferentially by direct or circumstantial evidence. *Alvarez*, 321 Ill. App. 3d at 703, 749 N.E.2d at 23, citing *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 357 N.E.2d 449 (1976), and *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 377, 618 N.E.2d 909, 915-16 (1993). " 'A *prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed "to perform in the manner reasonably to be expected in light of [its] nature and intended function." ' " *Alvarez*, 321 Ill. App. 3d at 703, 749 N.E.2d at 23, quoting *Tweedy*, 64 Ill. 2d at 574, 357 N.E.2d at 452.

The jury found that defendant breached its implied warranty of merchantability, impliedly finding the Sonata unmerchantable, and there is evidence to support this determination. The car failed to

perform in the manner reasonably to be expected in light of its nature and intended function as a mode of transportation when it periodically failed to start. A car that does not start and cannot be driven at will is clearly unmerchantable.

The question thus becomes whether the defect existed when the car left defendant's possession and control. A malfunction need not occur immediately upon purchase of the vehicle but can be inferred to exist at the time the car left the defendant's control through evidence of reasonable and proper handling of the car in the interim period between leaving the defendant's possession and control and manifestation of the malfunction. *Alvarez*, 321 Ill. App. 3d at 704, 749 N.E.2d at 24. " '[P]roof of a malfunction during normal use which tends to exclude other extrinsic causes is sufficient to make a *prima facie* case on the issue of the existence of a defective condition.' " *Alvarez*, 321 Ill. App. 3d at 704, 749 N.E.2d at 24, quoting *Johnson v. Amerco, Inc.*, 87 Ill. App. 3d 827, 830, 409 N.E.2d 299, 303 (1980).

Plaintiff demonstrated that the malfunction occurred in the absence of abnormal use or reasonable secondary causes. Her testimony that (a) she used the car only to drive to work, church and run errands, all normal uses; (b) it had never been vandalized, raced, off-roaded or flooded; and (c) she got an oil change two months after purchase demonstrates the absence of abnormal use. Similarly, the October oil change eliminates failure to maintain as a reasonable secondary cause of the car's failure to start, especially since the problem started only a month after plaintiff purchased the car, well prior to the 6-month/7,500-mile maintenance interval prescribed by defendant for compliance with the terms of its warranties.

The most likely secondary cause was the installation of the remote starter system three weeks after Plaintiff bought the car because plaintiff did not experience the no-start problems until after the system was installed. However, as stated previously, there is evidence to support the jury's determinations that plaintiff proved that "the aftermarket remote starter-alarm system was not the cause of the no-start condition." Accordingly, given that a car's failure to start is unarguably a failure to perform in the manner reasonably to be expected in light of its nature and intended function and plaintiff presented evidence eliminating abnormal use and reasonable secondary causes as the reason for the failure to start, plaintiff made a *prima facie* case that the Sonata was defective and that the defect existed when it left the manufacturer's control. The court did not err in denying defendant's motion for judgment *n.o.v.* on the breach of implied warranty of merchantability count.

## Consequential Damages

■ Defendant lastly argues that the court erred in entering judgment on the jury award of consequential damages because the limited warranty specifically excluded recovery for incidental and consequential damages. However, where a contract limits a remedy to repair and/or replacement of defective parts or goods and the remedy failed in its essential purpose, a provision excluding incidental and consequential damages will have no effect and those damages will be available to the plaintiff pursuant to the UCC. *Lara*, 331 Ill. App. 3d at 63, 770 N.E.2d at 729. "A remedy limitation fails of its essential purpose when a seller unreasonably delays the replacement of the product, refuses to replace it at all, or is unsuccessful in correcting the defects 'within a reasonable time.' " *Lara*, 331 Ill. App. 3d at 62, 770 N.E.2d at 728-29, quoting *Intrastate*, 315 Ill. App. 3d at 257-58. In finding that defendant breached its limited warranty, the jury necessarily found that defendant failed to perform the repairs within a reasonable number of attempts or within a reasonable time. Given that there was evidence to support the jury's determination, defendant's limited warranty of repair or replacement of defective parts failed of its essential purpose and defendant's exclusion of incidental and consequential damages under the same contract will not be enforced. The court did not err in entering judgment on the jury's award of such damages.

## Attorney Fees and Costs

■ The trial court awarded attorney fees and costs to plaintiff as the prevailing party. Pursuant to Section 2310(d)(2) of the Magnuson-Moss Act, such an award is within the trial court's discretion and will not be disturbed on review absent an abuse of that discretion. *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 685, 794 N.E.2d 843, 852 (2003); 15 U.S.C. § 2310(d)(2) (2000). Given that we affirm the trial court's judgment in favor of plaintiff on the breach of warranty claims and defendant does not argue that the fees and/or costs are excessive, we affirm the court's award of attorneys' fees and costs.

For the reasons stated above, we affirm the decision of the trial court.

Affirmed.

HOFFMAN, P.J., and HALL, J., concur.