In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-3407

BRADLEY A. BENSENBERG,
Executor of the Estate of
DONNA J. BENSENBERG,

*Plaintiff-Appellant,*

*v.*

FCA US LLC,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:17-cv-04123 — **Sara Darrow**, *Chief Judge.*

ARGUED SEPTEMBER 13, 2021 — DECIDED APRIL 8, 2022

Before RIPPLE, ROVNER, and SCUDDER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Plaintiff-appellant Bradley Bensenberg pursues this diversity action on behalf of his mother's estate seeking to recover on a claim of strict liability for injuries she sustained in a one-car accident in which her

vehicle's front airbag did not deploy. The district court granted a motion *in limine* to exclude the opinion of Bensenberg's expert that the vehicle's airbag was defective, in that the vehicle was likely traveling in excess of the deployment threshold for the airbag when the vehicle struck a concrete post and came to a halt, and yet the airbag failed to deploy. The flaw in the expert's opinion, the court reasoned, was that he did not identify any purported defect in the vehicle's airbag system but simply assumed from the airbag's failure to deploy that it must have had a defect of some unspecified type. The court went on to enter summary judgment in favor of the defendant. We reverse and remand for further proceedings. The opinion of the plaintiff's expert is admissible in order to show that the vehicle was traveling at a rate of speed sufficient to command deployment of the front airbag when it collided with the post. This in turn is sufficient to make a prima facie case of a non-specific defect in the vehicle's airbag system within the parameters that Illinois courts have established for such a defect.

## I.

On September 10, 2015, decedent Donna Bensenberg, age 85, was driving her 2008 Chrysler Aspen (a full-sized sport utility vehicle) eastbound on Wolf Road, a two-lane highway, outside of Geneseo, Illinois (about 20 miles east of the Quad Cities). She lost consciousness as the result of a medical episode. Her car drifted across the left lane and entered a grassy ditch running parallel to the highway at a speed that witnesses (including an Illinois State Police officer) placed at between 45 and 65 mph. When the car encountered a raised earthen driveway that crossed the ditch, it became airborne

and then returned to ground on the other side of the driveway, and eventually it came to rest upon striking a small concrete post. During the incident, the side-curtain airbag deployed when the vehicle's sensors detected a potential roll-over, but the front airbag did not deploy. Ms. Bensenberg was wearing her seat belt, and the pretensioner (a device designed to pull the seat belt tight in the event of an accident) deployed properly. Nonetheless, there are indications that when the vehicle came to a halt, Ms. Bensenberg's body came into contact with the steering wheel and the area of the dashboard beneath the steering wheel.

As a result of the accident, Ms. Bensenberg suffered an undisplaced fracture of the second cervical vertebra in her neck. She wore a cervical collar for three months but did not require surgery. She died of unrelated causes three years later, in November 2018.

Ms. Bensenberg filed this suit in 2017 against the car manufacturer, Fiat Chrysler Automotive or FCA US, formerly known as Chrysler Group ("Chrysler"), invoking the district court's diversity jurisdiction. Following his mother's death, Bensenberg stepped into her shoes as the plaintiff in his capacity as the personal representative of her estate. Counts I and II of the Fourth Amended Complaint alleged strict liability claims based on a manufacturing defect and a design defect, respectively, in the airbag system. Counts III through V alleged other theories of liability—strict liability for failure to warn, negligent failure to warn, and negligence—that are not at issue in this appeal. The estate also pursued claims below that the seatbelt system was defective, but those claims too are not raised on appeal.

The estate retained as its expert Bahram Ravani, Ph.D., a Professor in Mechanical Engineering and the Graduate Program in Forensic Sciences and Engineering at the University of California, Davis. Ravani has substantial experience and expertise in accident reconstruction, kinematics, and the biomechanical analysis of personal injury accidents. As relevant here, Ravani opined that, more likely than not, the Chrysler Aspen was traveling at a rate of speed closer to 53 miles per hour—the last speed recorded by the vehicle's event data recorder ("EDR") "black box," which was at or near the moment when the vehicle's side airbag deployed—than to five to 10 miles per hour (which would have been below the front airbag's mandatory deployment threshold) when it struck the concrete post.[1] Ravani's estimate of the vehicle's likely speed upon impact thus placed it above the 16 miles per hour must-deploy threshold for the front airbag. Ravani opined that if indeed the vehicle was traveling above the deployment threshold when it struck the post, "then the airbag system was defective in not deploying the airbag in such a high-energy impact." R. 49-5 at 19. The airbag's failure to deploy, Ravani further opined, left the driver unprotected "from contact forces to her body that [we]re the proximal cause of her diagnosed injuries." R. 49-5 at 18. But Ravani was unable to identify any particular component or aspect of the airbag system, including

---

[1]  Ravani referenced the range of five to 10 miles per hour because he assumed that the deployment threshold for the front airbag of the Chrysler Aspen was roughly 10 miles per hour. R. 42-3 at 98. Defense witnesses, however, indicated that the must-deploy threshold for the Aspen's front airbag was 16 miles per hour, with eight miles per hour representing a secondary, do-not-deploy threshold. *E.g.*, R. 55-2 at 18.

the airbag control unit ("ACU"), that he believed was defective. (The available data from the vehicle's airbag monitoring system revealed no fault in the operation of the airbag system.) His opinion as to the existence of a defect was instead based simply on the fact that the airbag did not deploy under circumstances in which he believed it should have deployed.

On Chrysler's motion, Judge Darrow excluded Ravani's opinion as to the existence of a defect, which she assumed was a purported defect in the design of the airbag. As the judge understood Ravani's reasoning, he surmised from the airbag's failure to deploy at a collision speed that he placed above its mandatory deployment threshold that the airbag must have been defectively designed; but he did not articulate a theory as to how the design of the airbag system was defective. R. 60 at 11. The judge did not quarrel with Ravani's opinion that the impact of the vehicle likely met the deployment threshold for the airbag, "but rather with his jump from this premise to the conclusion that the airbag system was thus defective. Dr. Ravani offers no evidence to establish how the airbag system's design was defective. … He concludes the cause from the effect." R. 60 at 10.

The court then proceeded to grant summary judgment in favor of Chrysler based on the lack of an expert opinion identifying any purported defect in the airbag system. The court reasoned that without expert guidance, a layperson would be unable to evaluate whether the airbag system was unreasonably dangerous as the result of a defect either in the design of the system or in the manufacturing process:

> The … airbag[ ] [is] not [a] simple product[ ]. Although most laymen are familiar with them, how they work in a general sense, and what they aim to prevent, most laymen do not know how they are designed. It is not obvious what … airbag components are hidden from view, how … the systems draw information and measure it, how they are affected by other systems in the car, the type of events/forces that trigger them to react, etc. Expert testimony is required to help the trier of fact determine that an airbag … system, which [is a] complex product[ ], was unreasonably dangerous under the consumer expectations test or the risk-utility test due to a defective design or manufacturing process.

R. 60 at 19.

## II.

Bensenberg has made clear on appeal that he is pursuing a claim of manufacturing defect and has abandoned any claim of design defect. His theory is one of a non-specific defect in the airbag. For that purpose, he relies, as he did below, on expert opinion to show that his mother's vehicle was likely traveling above the mandatory deployment threshold for the front airbag but that the airbag nonetheless failed to deploy. As a matter of Illinois law, he believes this evidence supports an inference that the airbag failed to deploy due to a manufacturing defect. He maintains that the district court erred in excluding the opinion of his expert as to the existence of such a defect and in entering summary judgment in favor of Chrysler.

The parties agree that in this diversity action we must look to Illinois law for the substantive legal principles governing Bensenberg's claim. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (federal court hearing case in diversity looks to choice-of-law rules of forum state); *Est. of Carey by Carey v. Hy-Temp Mfg., Inc.*, 929 F.2d 1229, 1232 (7th Cir. 1991) (under Illinois choice-of-law rules, place of injury supplies governing law unless another state has more significant relationship to occurrence or parties); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 864 (7th Cir. 1999) ("The parties agree that the substantive issues in this diversity suit are governed by Illinois law, and we do not look behind such agreements so long as they are reasonable, as this one is.") (citing *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 849 (7th Cir. 1999)); *Auto-Owners Ins. Co.*, 580 F.3d at 547 (same).

A strict liability claim is premised on a defect that renders a product dangerous because the product fails to perform in the manner one reasonably expects it to in light of its nature and intended function. *Tweedy v. Wright Ford Sales, Inc.*, 357 N.E.2d 449, 451 (Ill. 1976); *Dunham v. Vaughan & Bushnell Mfg. Co.*, 247 N.E.2d 401, 403 (Ill. 1969); *Hill v. Int'l Harvester Co.*, 798 F.2d 256, 258 (7th Cir. 1986) (Illinois law). To prevail on such a claim, a plaintiff must establish each of the following elements: (1) a condition of the product resulting from its manufacture or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 878 (7th Cir. 2021) (Illinois law) (citing *Clark v. River Metals Recycling, LLC*, 929 F.3d 434, 439 (7th Cir. 2019)); *see also*

*Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 345 (Ill. 2008). A product may be unreasonably dangerous as a result of (1) a manufacturing defect—that is, a physical defect in the individual product itself, (2) a defect in the product's design, or (3) the manufacturer's failure to warn of a known danger associated with the product or to instruct the consumer on the proper use of the product. *Mikolajczyk*, 901 N.E.2d at 335; *Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E.2d 101, 108–10 (Ill. App. Ct. 2010). A "manufacturing defect occurs when one unit in a product line is defective, whereas a design defect occurs when the specific unit conforms to the intended design but the intended design itself renders the product unreasonably dangerous." *Id.* at 108.

Illinois courts employ two different approaches to determining whether a product is unreasonably dangerous: the consumer expectations test and the risk-utility test. *Clark*, 929 F.3d at 439; *Mikolajczyk*, 901 N.E.2d at 348. The consumer expectations test asks whether the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 255 (Ill. 2007) (quoting Restatement (Second) of Torts § 402A, Comment i, at 352 (1965)). The risk-utility test balances the magnitude of the danger against the utility of the product, as designed. *Id.* at 257.

As we have noted, Bensenberg's theory on appeal is that a manufacturing defect was responsible for the failure of the airbag, and he invokes the consumer expectations test as the appropriate framework to establish that the defect rendered

the airbag unreasonably dangerous. In the usual case, expert testimony is required to establish that a product presents an unreasonable danger as a result of a defect. *See Show v. Ford Motor Co.*, 659 F.3d 584, 588 (7th Cir. 2011) (Illinois law); *Kirk*, 991 F.3d at 878–79; R. 60 at 18. Among the expert's tasks in such a case would be to identify the particular defect that gives rise to the danger. *See*, *e.g.*, *Baltus v. Weaver Div. of Kidde & Co.*, 557 N.E.2d 580, 588–90 (Ill. App. Ct. 1990). It was in this regard that the district court found Ravani's opinion wanting.

However, Illinois recognizes a claim for non-specific defect, which, in the appropriate case, relieves the plaintiff of the obligation to identify a particular defect in the product in order to make a prima facie case of product liability. *Tweedy*, 357 N.E.2d at 452; *Horne v. Elec. Eel Mfg. Co.*, 987 F.3d 704, 726 (7th Cir. 2021) (citing *DiCosolo v. Janssen Pharm., Inc.*, 951 N.E.2d 1238, 1244 (Ill. App. Ct. 2011)); *McKenzie v. S K Hand Tool Corp.*, 650 N.E.2d 612, 616 (Ill. App. Ct. 1995); *Varady v. Guardian Co.*, 506 N.E.2d 708, 711–12 (Ill. App. Ct. 1987). The plaintiff may instead resort to circumstantial evidence that supports an inference that the product was defective, by showing that the product failed to perform as expected, in light of its nature and intended function, and that the product was not being used abnormally and that there were no reasonable secondary causes of failure. *Tweedy*, 357 N.E.2d at 452; *Horne*, 987 F.3d at 726. This is the framework that Bensenberg references on appeal.

Bensenberg's theory that there was a non-specific defect in the Chrysler's airbag proceeds as follows: The front airbag was designed to deploy when the vehicle struck a fixed, non-

deformable barrier at an impact speed of at least 16 miles per hour. When his mother's vehicle left the roadway and the side airbag deployed, the vehicle's EDR indicated that the vehicle was traveling at a rate of 53 miles per hour. Because the EDR stopped recording the vehicle's speed at that point in time, there is no direct evidence of how fast it was traveling when it subsequently struck the concrete post. Based on witness statements and the other available data regarding the accident, Dr. Ravani opined that when the vehicle struck the post, it was likely traveling at a rate closer to 53 miles per hour than to five or 10 miles per hour—in other words, above the 16 miles per hour mandatory deployment threshold for the front airbag. R. 49-5 at 16–17. Yet the airbag did not deploy as one would expect it to have done under these circumstances.

Before we turn to the merits of Bensenberg's claim, we must deal with two preliminary objections to the claim as Bensenberg has framed it on appeal.

Chrysler first contends that Bensenberg waived any theory of manufacturing defect by not making it below. Based on Ravani's deposition, Chrysler understood Bensenberg to be asserting a claim of design defect only, and the district court's order excluding Ravani's opinion as to the existence of a defect in the airbag system and granting Chrysler's motion for summary judgment indicate that its understanding was the same. R. 60 at 9, 11.[2] However, Bensenberg's memorandum

---

[2]   During Ravani's deposition, Chrysler's counsel pressed Ravani on whether he was truly comfortable asserting that the front airbag malfunctioned, given the airbag monitoring system's failure to detect any fault in

(continued...)

opposing summary judgment indicated that he was pursuing claims of both design defect and manufacturing defect. R. 49 at 12, 19. No doubt his briefing could have been clearer on this point, but a close reading of his memorandum leaves no doubt that he was asserting a claim of manufacturing defect in addition to a claim of design defect. Bensenberg did not waive his claim of manufacturing defect.

Chrysler also contends that Bensenberg waived his theory of non-specific defect and his reliance on *Tweedy* and its

---

[2] (...continued)
functioning of the airbag and the lack of a dashboard warning light signaling a problem with the airbag. R. 42-3 at 125–26. In response to counsel's questioning, Ravani suggested that the airbag's failure to deploy could have been attributable to a problem with the system's design, *i.e.*, that the airbag was not designed to deploy under the particular circumstances of this accident but that it should have been so designed. R. 42-3 at 126–30. Ravani did not rule out the possibility that the system was not functioning properly, *i.e.*, that there was a manufacturing defect which prevented it from operating as designed. R. 42-3 at 130. But in view of the findings of Chrysler's experts that the system was functioning properly (which defense counsel had highlighted in his questioning), Ravani expressed a willingness to take the defense experts at their word, which would leave only a design defect as the explanation for the airbag's failure to deploy. R. 42-13 at 130 ("Now, does that indicate that the air bag did not function? It could. But your experts have looked at it and they're saying no, it did not [malfunction]. The air bag is functioning properly, alright? And I take their word. So the air bag, *assuming it is functioning properly*, then the only other option is that the air bag is not properly designed … .") (emphasis ours). Reading Ravani's remarks in context, we do not understand him to have conceded away the possibility of a manufacturing defect. In any case, Ravani, as a witness, was not in a position to formally waive, on the plaintiff's behalf, the non-specific manufacturing defect theory that Bensenberg is asserting.

progeny (laying out the rationale underlying that theory) by failing to advance such a theory below. However, in his memorandum opposing summary judgment and also in his memorandum opposing the motion to exclude Ravani's opinion, Bensenberg employed the language and logic of the non-specific defect cases and cited authorities discussing non-specific defects. R. 48 at 11, 20–21 (describing non-specific defect theory as "malfunction theory"); R. 49 at 21. Again, his two memoranda could have been clearer on this point, and it is true that Bensenberg did not cite the seminal *Tweedy* case in particular. But it is noteworthy that Chrysler *itself* cited *Tweedy* in replying to Bensenberg on the summary judgment motion. R. 56 at 6. So there can be no doubt that Chrysler was on notice that Bensenberg was advancing a non-specific defect theory. Bensenberg did not waive the theory of a non-specific manufacturing defect in the airbag system.

Apart from the waiver issues, Chrysler also argues that the non-specific defect theory articulated in *Tweedy* and like cases is inapplicable here, given the age of Bensenberg's vehicle and its substantial degree of use preceding the accident. For purposes of addressing this argument, it is worth discussing *Tweedy* in some detail.

In *Tweedy*, the brakes failed on a car that had been purchased (used but relatively new) some four months earlier and had only 7,500 miles on it; the driver suffered injuries as a result of the incident. Prior repairs had been made to the vehicle, but not to the brakes. The plaintiff pursued a claim of strict liability, but produced no expert testimony identifying any particular defect in the brake system of the vehicle. The Illinois Supreme Court nonetheless concluded that a factfinder

could infer the existence of such a defect from the failure of the brakes to work as expected:

> Here the evidence shows that the brakes of an automobile driven approximately 7,500 miles, inspected … prior to delivery, inspected again at 6,000 miles, and subjected to no abnormal use prior to the occurrence failed to function in the manner reasonably to be expected. Plaintiff was driving carefully at a reasonable rate of speed, the weather was good, the roads were dry, he knew the intersection well, and there was no evidence of any reasonable secondary cause.

357 N.E.2d at 452. Consequently, it was reasonable to infer that the vehicle's brakes must have been defective at the time that they left the seller's control and expert testimony was not required in order to make out a *prima facie* case of a product defect. *See id.* at 451–52.

As Chrysler points out, subsequent cases have distinguished *Tweedy* when the product at issue is older, has been subject to extensive use, and there are other apparent potential secondary causes of failure apart from a defect in the design or manufacture of the product that cannot be ruled out. *See, e.g.,* *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 899 (7th Cir. 2011) (distinguishing *Tweedy* on ground that allegedly defective scaffold had been in use and subject to normal wear and tear for a period of seven years and plaintiff had produced no evidence as to condition of scaffold when it came into his possession).

The vehicle at issue here was anything but new. Bensenberg had purchased the Chrysler Aspen used in 2009 with about 27,000 miles already on the odometer. By the time of the accident some six years later, the vehicle had accrued a total of roughly 128,000 miles and had been serviced and repaired repeatedly. On its face, this case would appear to be a far cry from the scenario at issue in *Tweedy*.

But given the particular vehicular component at issue here, we are not convinced that Bensenberg was necessarily precluded from relying on *Tweedy*'s articulation of the non-specific defect theory. Chrysler's argument in this respect presumes that the reliability and efficacy of all vehicular components decline with time and usage of the vehicle, as is the case with brakes or tire treads, for example. But airbags are only used when deployed. Replacement will obviously be required following deployment, but otherwise, nothing in this record suggests that the lifespan of a modern airbag is shorter than the seven to eight years this vehicle was in use prior to the accident. *See* Ronald Montoya, *Do car airbags expire?*, EDMUNDS (Mar. 29, 2013), https://www.edmunds.com/car-safety/do-car-airbags-expire.html (visited April 4, 2022) (noting modern technology enables airbags to last for life of vehicle); *cf.* Owner's Manual, 2008 Chrysler Aspen, at 61 (noting that "the airbag system is designed to be maintenance free"), available at https://carmanuals2.com/get/chrysler-aspen-2008-owner-s-manual-31277 (visited April 4, 2022). As Chrysler has emphasized in this litigation, vehicles including this one are equipped with a monitoring system that will alert the driver if there is a problem with the supplemental restraint system. Moreover, as the plaintiff points out, airbags are contained

within the vehicle in such a way that makes tampering, modification, or inadvertent damage to the airbags difficult. There is no indication in the record that the airbags in this particular vehicle ever deployed, such that replacement was required, nor is there any indication the vehicle's electronic monitoring system alerted Ms. Bensenberg to a potential malfunction or a need to service or replace the airbag system.[3] On these facts, assuming the admissibility of Ravani's opinion as to the likely speed of Ms. Bensenberg's vehicle at the time of impact, a jury could find that, notwithstanding the age, mileage, usage, and repair history of the vehicle, Ms. Bensenberg could reasonably expect the front airbag to deploy if her vehicle struck an immovable object at a rate of speed in excess of the airbag's deployment threshold.

A further word is in order here about Ravani's opinion and its relationship to Bensenberg's claim. In assessing the admissibility of Ravani's opinion under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), the district court labored under the impression that Ravani was obliged to

---

[3] Our understanding of the deposition testimony of Emanuel Goodman, who worked for ZF Friedrichshafen AG (formerly TRW Automotive), which manufactures airbag control units and sensors, is that the data downloaded from the Chrysler Aspen's ACU reflects a relatively comprehensive history of the vehicle's airbag system, including faults. *See* R. 42-5 at 7–11, Goodman Dep. at 22–41. The data indicated that there were prior fault warnings for the airbag system, but not at the time of the accident. We may therefore assume that neither the prior ownership and use of the vehicle by someone other than Ms. Bensenberg nor her own extensive use of the vehicle cast doubt on the functionality of the airbag system, and that had there been a problem with the system at the time of the accident, the ACU data would have reflected it.

identify a specific defect in the airbag system. She therefore viewed as *ipse dixit* his conclusion that the airbag system was defective because the front airbag did not deploy notwithstanding the collision with the concrete post at a speed above the deployment threshold for that airbag. R. 20 at 6, 10, 11. But this misapprehends the nature of Bensenberg's theory of the case. Because Bensenberg is pursuing a claim of non-specific defect, he is not obliged to identify a particular defect in the airbag system and nor was Ravani's opinion rendered inadmissible because he did not identify such a defect. In this regard, the district court erred in excluding his opinion as to the existence of a defect. Again, the district court's failure to appreciate the nature of the theory that Bensenberg was pursuing may well have been due to the lack of clarity in his briefing. But for the reasons we have set out above, we are satisfied that Bensenberg did enough to preserve the theory of non-specific manufacturing defect that he presses on appeal.

This is not to say that expert testimony was not required to support Bensenberg's theory of the case. The premise of Bensenberg's claim of non-specific defect, after all, is that the vehicle struck the concrete post while traveling at a speed in excess of the front airbag's deployment threshold. There is no direct evidence of the vehicle's speed at the moment of impact. The vehicle's EDR stopped recording the SUV's speed when the vehicle became airborne after striking the earthen driveway crossing the ditch. And Ms. Bensenberg herself had lost consciousness. Consequently, the vehicle's likely speed must be deduced from what information is available from the vehicle's EDR, witnesses to the incident, and the damage to the vehicle, among other sources. This is not the sort of determina-

tion that the ordinary layperson would have the capability to make for himself; it calls for expertise in accident reconstruction. Toward that end, both parties offered expert opinion as to the likely speed of the SUV at the moment of impact.

There is no real dispute that Ravani was qualified to render an opinion as to the vehicle's likely speed at impact. Given the ground on which the district court excluded Ravani's opinion, it was not necessary for the district court itself to reach the matter of Ravani's qualifications.[4] But the record makes plain that Ravani has extensive experience and expertise in accident reconstruction, such that he is qualified to render an opinion on this point. Chrysler itself raises no question about Ravani's expertise in this regard. *See* R. 42 at 4; R. 55 at 1; R. 20 at 8 n.4. Its focus instead is whether Ravani's opinion is admissible absent him being able to identify a specific defect in the airbag system, and we have resolved that point in Bensenberg's favor.

Nor, for purposes of this appeal, do we discern any obvious fault with Ravani's methodology. Ravani appears to have taken the same general approach to estimating the vehicle's speed at impact as the defendant's expert, Matthew Weber: that is, he looked to the evidence bearing on the vehicle's path of travel, the available data regarding the vehicle's speed at the moment it became airborne, the distance the vehicle traveled when it returned to the ground, and the clues offered from the damage that the vehicle incurred as a result of the collision. R. 55-2. The two experts obviously reached different conclusions:

---

[4] Bensenberg contends that this was an error on the court's part, but we disagree: the court could rightly assume his qualifications but find his opinion inadmissible on an unrelated ground.

Weber opined that the vehicle was traveling below the airbag deployment threshold when it struck the post. R. 55-2 at 18. But Chrysler points to no flaw in Ravani's methodology that would render his opinion inadmissible or that would preclude the facfinder from relying on it. *See* R. 20 at 9 ("Defendant has not argued that these methods were unlikely to produce a reliable estimate of the Aspen's speed at final impact.").[5] Indeed, as we have already mentioned, the district court itself had no quarrel with the admissibility of Ravani's opinion that the vehicle was likely traveling above the airbag deployment threshold at the moment of impact, which was the very purpose for which plaintiff offered his opinion. R. 20 at 10.

What remains, then, is whether Bensenberg has presented enough evidence to make out a prima facie case of strict liability for a manufacturing defect, within Illinois' framework for a claim of non-specific defect. On the limited record and arguments presented to us on this point, we conclude that he has. Again, Bensenberg's theory is that under the circumstances of this accident, the vehicle collided with an immovable object, the concrete post, while traveling at a rate of speed above the airbag's must-deploy threshold. Ravani's opinion was offered to establish the vehicle's likely speed on impact, and he concluded that the vehicle more likely than not was traveling closer to 53 miles per hour (the last recorded speed

---

[5] Chrysler has argued that Ravani was wrong to rely on the state police officer's observations as to the path and distance the vehicle traveled after leaving the roadway in making estimates as to the vehicle's likely speed when it impacted the post. But, in context, we view this as an objection to the weight that the factfinder should give to Ravani's opinion rather than a potentially disqualifying objection to his expertise and methodology.

on the vehicle's EDR) than to five to 10 miles per hour. If credited, that opinion tends to rule out the most obvious and likely secondary explanation for the airbag's failure to deploy: that the vehicle's speed when it struck the concrete post was below the airbag's deployment threshold. And given the data from the vehicle's ACU indicating that the airbag system was functioning properly at the time of the accident, a factfinder could infer the airbag had not been subject to abuse or tampering that might interfere with its operation. This in turn would permit an inference that there was a non-specific defect in the vehicle's airbag system that accounts for the front airbag's failure to deploy.

On this record, then, there is a fact question that precludes summary judgment in favor of Chrysler.

### III.

The judgment is reversed, and the case is remanded for further proceedings consistent with this decision.