In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 25-1963

THOR ZURBRIGGEN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

TWIN HILL ACQUISITION, INC., *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-05648 — **John J. Tharp, Jr.**, *Judge*.

———————————

ARGUED FEBRUARY 13, 2026 — DECIDED JUNE 16, 2026

———————————

Before BRENNAN, *Chief Judge*, and HAMILTON and
SCUDDER, *Circuit Judges*.

BRENNAN, *Chief Judge*. In 2015, American Airlines contracted with Twin Hill Acquisition, Inc., to manufacture new uniforms for its employees. After American released the new apparel, hundreds of employees complained of health problems ranging from itchy eyes to severe allergic reactions. Some claimed they suffered reactions just from being near the Twin Hill uniforms.

Many employees sued the airline and the manufacturer under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), bringing claims under both products liability and intentional tort theories of liability. After resolving a jurisdictional issue, the district court excluded the plaintiffs' expert witnesses and granted summary judgment for the defendants. The plaintiffs appeal. We adopt the district court's first-rate opinion, limiting our discussion to the jurisdictional question and plaintiffs' invocation of res ipsa loquitur in support of its products liability theories.

## I. Background

### A. Factual

American Airlines rolled out a new line of uniforms for flight attendants, pilots, and other "above the wing" employees throughout 2016. But the uniforms, manufactured by Twin Hill, quickly prompted backlash. After the flight attendants' union encouraged employees to report their concerns, American received hundreds of complaints. Some claimed problems with sizing, while many others complained the uniforms were making them "itchy" or giving them "scratchy" eyes and throats. Still others reported different health-related complaints, like allergic reactions, rashes, hives, dermatitis, throat swelling, and respiratory symptoms.

One month later, American reversed its rollout of the Twin Hill uniforms. Employees were allowed to wear their old uniforms or to purchase off-the-rack substitutes. By March 2017, American offered another uniform option produced by a different company. Yet, some employees still claimed they were experiencing "proximity reactions" to the Twin Hill uniforms—that is, they had severe allergic reactions simply from

being near people wearing them. By 2020, American had fully replaced the Twin Hill uniforms with alternatives from Lands' End.

Before and after rolling out the Twin Hill uniforms, American conducted wear tests and chemical analysis to ensure the uniforms were safe. One pre-release test led to complaints of irritation, so American retained Intertek for expert lab evaluation. Intertek performed a test and found chemicals that theoretically could trigger allergic reactions or rashes, but it opined the doses discovered were too low to produce those results. It also noted that some of the chemicals were common in perfumes, so they could have been transferred onto the garments during the wear test. Later, Intertek performed a second test of unworn garments, which produced similar results.

In addition to Intertek, the National Institute for Occupational Safety and Health (NIOSH) tested the uniforms. Intertek had concluded it was "possible, but unlikely" that some of the chemicals in the uniforms could cause a rash if people were already allergic to these chemicals, given the low quantities. NIOSH concurred, concluding that the "results of the uniform samples testing did not reveal a pattern of chemical or metal contamination that would indicate a cause for the widespread reported symptoms." NIOSH also found it highly unlikely that the uniforms could cause proximity reactions. Other independent testing reached the same conclusion.

### B. Procedural

A group of 74 named plaintiffs sued Twin Hill, American Airlines, and several other defendants in August 2017. Invoking federal jurisdiction under the Class Action Fairness Act of 2005 (CAFA), *see* 28 U.S.C. § 1332(d)(2), the plaintiffs raised

several pure questions of state tort law and sought to certify two different classes of injured employees.[1]

After several motions to dismiss and discovery battles, the plaintiffs filed their third amended complaint. This pleading distilled their grievances down to four. Against Twin Hill, they asserted strict and negligent products liability theories, arguing that the uniforms were defective and caused plaintiffs' injuries. And against both Twin Hill and American, they brought battery and intentional infliction of emotional distress claims, alleging the companies forced employees to wear defective and harmful uniforms.

Notably, this third amended complaint also announced that the plaintiffs had "elected to drop their class claims in order to proceed to bellwether trials." Elsewhere in that complaint, plaintiffs stated "they will not be seeking class certification for the proposed classes due to, among other things, passage of time." Discovery continued under this version of the complaint.

In September 2024, Twin Hill and American moved for summary judgment as to the first flight of bellwether plaintiffs. These defendants also moved to exclude the testimony of two expert witnesses offered by the plaintiffs: Dr. Arch Carson and Dr. Peter Hauser. The defendants' summary judgment motions hinged on the exclusion of these experts. No professional testing had revealed chemicals in the uniforms

---

[1] As the district court noted, the plaintiffs hail from many states, complicating the choice of law inquiry. Yet the court explained how all possible jurisdictions required the same threshold questions to be satisfied for the plaintiffs to proceed. We agree that the choice of law issue is not dispositive.

capable of causing the range of harmful reactions plaintiffs alleged. So, these two experts supplied the sole evidence of harm, defects, and causation of the plaintiffs' injuries.

In response, the plaintiffs invoked the tort doctrine of res ipsa loquitur. Though plaintiffs had not referenced this principle in their amended complaint, they did so in response to Twin Hill's motion for summary judgment. To plaintiffs, their two experts did not need to provide a specific theory of defect or causation. Instead, circumstantial evidence supported their experts' opinions on the likelihood of these injuries occurring in the absence of a defect. Accordingly, plaintiffs sought to shift the burden of proof onto the defendants.

The district court granted the defendants' motions for summary judgment. In a thorough opinion, the court identified a weakness in the plaintiffs' case. Under each of plaintiffs' four liability theories, they needed to show the uniforms were actually defective and caused their injuries. To make that showing, plaintiffs required expert testimony. The district court concluded that Dr. Carson and Dr. Hauser each had employed an unreliable methodology, so their reports were excluded from the summary judgment record. That meant the plaintiffs' liability theories faltered because they could not connect the alleged harms to the condition of the uniforms. The plaintiffs appeal.

## II. Subject Matter Jurisdiction

Before turning to the merits, we must address jurisdiction. *Chi. Tchrs. Union, Loc. 1 v. Educators for Excellence, Inc.*, 159 F.4th 524, 528 (7th Cir. 2025). Whether the parties brief this issue or not, appellate courts have an independent obligation

to ensure that jurisdiction is proper. *Knopick v. Jayco, Inc.*, 895 F.3d 525, 528 (7th Cir. 2018).

### A. *Royal Canin* **and CAFA**

A district court has original jurisdiction under CAFA if a plaintiff can satisfy three prerequisites. First, the amount in controversy must exceed $5,000,000. 28 U.S.C. § 1332(d)(2). Second, certain minimal diversity requirements must be met. *Id.* at (d)(2)(A)–(C). Third, the action must be "a class action." *Id.* at (d)(2).[2] The first two are not at issue here, but the third raises some uncertainty.

CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute." 28 U.S.C. § 1332(d)(1)(B). This court was the first to hold that subsequent developments in a case, such as failing to achieve or pursue class certification, do not destroy CAFA jurisdiction. *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806–07 (7th Cir. 2010). The logic behind this rule is that the statute only requires the action to be "*filed* under Rule 23." *Id.* at 806 (emphasis added). Like the "time-of-filing" rules that apply to amount in controversy and party citizenship in ordinary diversity cases, this rule fixes jurisdiction based on the terms of the complaint. *Sykes v. Cook Inc.*, 72 F.4th 195, 205 (7th Cir. 2023) (amount in controversy); *Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 867 (7th Cir. 2012) (party citizenship).

While this case was pending in the district court, the Supreme Court decided *Royal Canin U.S.A., Inc. v. Wullschleger*,

---

[2] The district court should also decline to exercise jurisdiction in some kinds of cases, 28 U.S.C. § 1332(d)(4), but this issue is not disputed here. *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 535–36 (7th Cir. 2011).

604 U.S. 22 (2025). That case reminds courts that the "plaintiff is 'the master of the complaint,' and therefore controls much about her suit." *Id*. at 35. This control "extends beyond the time her first complaint is filed," allowing a plaintiff to amend away all prior grounds for the court's jurisdiction. *Id.* An amendment "effectively remake[s] the suit," including "its jurisdictional basis: The reconfiguration accomplished by an amendment may bring the suit either newly within or newly outside a federal court's jurisdiction." *Id.* at 35–36.

Though *Royal Canin* is a case about removal jurisdiction, it reaffirmed the point that jurisdiction in "original federal cases" must be strictly tied to "an amended pleading." *Id.* at 36 (citing *Rockwell v. Int'l Corp. v. United States*, 549 U.S. 457 (2007)). And it noted that plaintiffs can "destroy[] diversity jurisdiction" in an original action by changing the parties to the case. *Id.* at 37. "In short, the rule in original cases," which says "that jurisdiction follows the amended … pleading," applies "across the board." *Id.*

*Royal Canin* does not discuss CAFA jurisdiction, but its reasoning is still relevant. A plaintiff who amends his complaint to remove parties needed for minimal diversity, for example, would unquestionably change the basis for jurisdiction under CAFA. *Id.* It follows that an amendment removing class allegations would accomplish the same effect, as the case would no longer be "filed under Rule 23." 28 U.S.C. § 1332(d)(1)(B).

In the third amended complaint, plaintiffs did exactly that. They stated they "have elected to drop their class claims in order to proceed to bellwether trials." And though their complaint still included a section entitled "Class Action Allegations," the plaintiffs added a footnote saying, "As Plaintiffs

have informed … the Court, they will not be seeking class certification for the proposed classes due to, among other things, passage of time." They believed jurisdiction still existed "because jurisdiction was proper at the time of filing." But this contradicts the rule in *Royal Canin* that an amended complaint "effectively remake[s] the suit." 604 U.S. at 35. So, plaintiffs' pleading of the third amended complaint may have resulted in the district court losing CAFA jurisdiction for some time.

## B. Fourth Amended Complaint

After the Supreme Court issued *Royal Canin*, the district court perceptively noticed this potential problem. So, it ordered supplemental briefing on "the effect of the plaintiffs' decision to drop their class allegations … on this Court's subject-matter jurisdiction." Both sides responded that the court still had jurisdiction. They noted that *Royal Canin* considered a different statute (28 U.S.C. § 1367) in a different context (removal jurisdiction) and that the Supreme Court decision did not discuss CAFA. And the parties pointed to this court's decision in *In re Burlington Santa Fe Railway*, 606 F.3d 379 (7th Cir. 2010), which ruled that jurisdiction is secure "even though, after removal, the plaintiffs amended their complaint to eliminate the class allegations." *Id.* at 380.

In tandem with their response, the plaintiffs filed a fourth amended complaint. That document deletes the language from the third amended complaint about not seeking class certification, pleading all CAFA's jurisdictional prerequisites with more specificity.

The district court "conclude[d] that it possesses subject-matter jurisdiction over this action under the Class Action Fairness Act notwithstanding the lack of a certified class" in a

footnote to its summary judgment opinion. Though the court noted that *In re Burlington* likely stood on thin ice after *Royal Canin*, it declined to deviate from Seventh Circuit precedent without clearer guidance.[3] In sum, the court reasoned that the "operative fourth amended complaint unambiguously invokes CAFA and pleads its jurisdictional prerequisites."

The district court reached the correct conclusion. What matters under CAFA is whether the action was "filed under rule 23." 28 U.S.C. § 1332(d)(1)(B). As *Royal Canin* teaches, every amended complaint effectively remakes the suit, including "its jurisdictional basis." 604 U.S. at 35. Even if the third amended complaint undercut subject matter jurisdiction, the fourth amended complaint effectively re-filed the case as a "class action," securing jurisdiction under CAFA. The plaintiffs revised their complaint once to destroy jurisdiction, and then they did so again to save it.

Under this reasoning, the district court had subject matter jurisdiction over this case when it granted the defendants summary judgment. We move next to the merits.

### III. Expert Witness Exclusions and Intentional Torts

The district court resolved this case for the defendants on summary judgment. Rather than repeat that court's analysis on the exclusion of plaintiffs' expert witnesses and plaintiffs' intentional tort liability theories, on those topics we incorporate its rulings by reference. *See generally Zurbriggen v. Twin*

---

[3] Because this issue is not squarely presented, we need not decide whether *In re Burlington* has been directly overruled by *Royal Canin*. Any future consideration of removal jurisdiction under CAFA, though, must consider the tension between these cases.

*Hill Acquisition Co., Inc.*, No. 1:17-cv-5648, 2025 WL 1092973 (N.D. Ill. Apr. 11, 2025).[4]

As the district court recognized, the plaintiffs failed to identify any specific defect with the Twin Hill uniforms. And the district court properly excluded the expert testimony of Dr. Carson and Dr. Hauer because of their unreliable methods. Even these experts, moreover, concede that there was no identifiable chemical or group of chemicals in the uniforms capable of triggering the range of reactions the plaintiffs allege. Without this expert testimony, there is no evidence from which a reasonable jury could conclude that the defendants caused plaintiffs harm—especially not that the uniforms caused proximity reactions harming plaintiffs from afar.

### IV. Res Ipsa Loquitur

In an effort to overcome the lack of direct evidence of any defect, the plaintiffs raise the doctrine of res ipsa loquitur. They submit that circumstantial evidence in the record supports an inference under this doctrine that Twin Hill is liable for their injuries on their products liability theories.

On appeal, plaintiffs offer two types of res ipsa arguments. First, they ask us to apply the Illinois law doctrine developed in *Tweedy v. Wright Ford Sales, Inc.*, 357 N.E.2d 449 (Ill. 1976), which applies only to strict liability theories. Second, they cite the traditional variant of res ipsa loquitur to prove their negligent manufacturing arguments against Twin Hill.

---

[4] We thank the Lawyers for Civil Justice for its helpful *amicus curiae* brief in this case discussing the 2023 amendments to Federal Rule of Evidence 702 on expert witnesses.

The district court limited its discussion of res ipsa loquitur to a footnote, finding that "[t]he record decidedly forecloses any … notion" that the doctrine applies to this case.[5] Because the plaintiffs make this issue a core component of this appeal, however, their reliance on these related doctrines warrants a deeper discussion.

### A. Strict Liability: *Tweedy* Doctrine

Under Illinois law,[6] "[a]n injured plaintiff may allege one of two types of products liability claims: a strict liability claim or a negligence claim." *Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E.2d 101, 108 (Ill. App. Ct. 2010) (citing *Blue v. Env't Eng'g, Inc.*, 828 N.E.2d 1128, 1137 (Ill. 2005)). In a strict liability

---

[5] District Court D.E. 701 at 41 n.19. The court listed the following evidence in support of its conclusion that negligence through res ipsa loquitur could not be inferred:

- plaintiffs' symptoms were not unique to exposure to a toxic substance;
- the Intertek results do not indicate that any detected substance could trigger the plaintiffs' symptoms at low concentrations;
- several alternative explanations for plaintiffs' symptoms were not only plausible but endorsed by plaintiffs' own treating physicians;
- the actual rate of symptomology among exposed employees is unknown; and, in any case,
- a toxic chemical on the Twin Hill uniforms would not necessarily reflect that the manufacturer was negligent, as opposed to post-production corruption.

[6] We recognize that the parties disputed the choice of law before the district court. *See supra* note 1. The plaintiffs have proceeded on appeal as if the *Tweedy* doctrine governs this case, though they have not cited to states other than Illinois recognizing this rule. We proceed as if Illinois law applies on this theory because the choice of law does not change the outcome.

claim, "the focus of the inquiry is on the condition of the product itself." *Id.* As we have explained, "A strict liability claim is premised on a defect that renders a product dangerous because the product fails to perform in the manner one reasonably expects it to in light of its nature and intended function." *Bensenberg v. FCA US LLC*, 31 F.4th 529, 535 (7th Cir. 2022).

Ordinarily, plaintiffs need to prove three elements to make a prima facie showing of strict products liability. They must show "the injury resulted from a condition of the product," "the condition was an unreasonably dangerous one," and "the condition existed at the time it left the defendant's control." *DiCosolo v. Janssen Pharms., Inc.*, 951 N.E.2d 1238, 1243 (Ill. App. Ct. 2011). This burden would typically be satisfied by proffering expert testimony identifying a dangerous defect in the product. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 878 (7th Cir. 2021) (quoting *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 345 (Ill. 2008)).

But in *Tweedy*, the Supreme Court of Illinois articulated an alternative pathway to make this prima facie showing. There, the brakes on a car failed without explanation, and the driver was injured in the subsequent crash. 357 N.E.2d at 450–51. The plaintiff offered no expert testimony supporting a finding that the brakes were defective at the time they left the manufacturer's control. *Id.* at 451. But how else could the accident have occurred? Sure, "[e]lves may have played ninepins" with the product, but absent such absurd possibilities, "an accident can itself be evidence of liability." *Welge v. Planters Lifesavers Co.*, 17 F.3d 209, 211 (7th Cir. 1994). So, the court allowed the strict liability claim to proceed.

As long as plaintiffs can show that "the product failed to perform in the manner reasonably to be expected in light of

[its] nature and intended function," and there is no evidence of "abnormal use or reasonable secondary causes," they can make out a "prima facie case that a product was defective." *Tweedy*, 357 N.E.2d at 452 (citation modified). In other words, the plaintiff can bypass proof of a specific dangerous defect so long as "the product failed to perform as expected," and there are no better explanations for its failure. *Bensenberg*, 31 F.4th at 536.

Simply put, the *Tweedy* doctrine does not apply here. In car crash cases, like *Tweedy* or *Bensenberg*, the connection between the alleged defect and the injury is usually obvious. Brakes do not normally fail absent a defect, and it is not hard to see how the presumed brake failure caused the injuries.

That makes the *Tweedy* doctrine a poor fit for this case. Unlike brake failures, it does not follow that the uniforms could cause the wide range of symptoms reported by American's employees. The *Tweedy* doctrine does not satisfy plaintiffs' burden to show that a defect caused their injuries—it goes to "the condition of the product" when it left the "manufacturer's control," not whether the injury is "the result of the condition of the product." *Parker v. Freightliner Corp.*, 940 F.2d 1019, 1026 (7th Cir. 1991). But after the district court excluded their experts, the plaintiffs had no evidence that the injuries were "the result of the condition of the product." *Id.*

Add to this that the *Tweedy* factors do not match the facts here. The plaintiffs stretch the doctrine's logic by saying the uniforms "failed to perform as expected." *Bensenberg*, 31 F.4th at 536. These uniforms did not "fail" in the way Illinois courts normally understand the term—they did not break, collapse, or malfunction. *Varady v. Guardian Co.*, 506 N.E.2d 708, 712 (Ill. App. Ct. 1987) (crutches collapse); *Alvarez v. Am. Isuzu Motors*,

749 N.E.2d 16, 21–22 (Ill. App. Ct. 2001) (car transmission failure); *Pike v. ABSS Mfg. Co.*, No. 1-21-0676, 2023 WL 5202396, at *1 (Ill. App. Ct. Aug. 14, 2023) (ladder collapse); *Weedon v. Pfizer, Inc.*, 773 N.E.2d 720, 722 (Ill. App. Ct. 2002) (implanted medical device malfunction); *DiCosolo*, 951 N.E.2d at 1243 (medicinal fentanyl patch presumed defective when it released a lethal dose of the drug). And the plaintiffs cannot successfully exclude "reasonable secondary causes" of failure. *Tweedy*, 357 N.E.2d at 452. As the district court observed, all the bellwether plaintiffs in the case raise different theories of harm and had different underlying medical conditions. Even before the experts were excluded, their testimony could not establish that substances on the uniforms alone accounted for these harms.

Read together, these two points show why the *Tweedy* doctrine does not apply here. Res ipsa-style theories are appropriate when the fact that an injury occurred "speaks for itself." *Ruark v. Union Pac. R.R.*, 916 F.3d 619, 623 (7th Cir. 2019). That the plaintiffs here experienced various reactions simply does not signal the existence of a defect or an error without more evidence. Alternative explanations could account for the injuries of these plaintiffs; a defect is not the most obvious answer.

### B. Negligence: Res Ipsa Loquitur

The plaintiffs also ask us to apply the traditional variant of res ipsa loquitur for their negligent manufacturing theory. This burden is even higher for a negligence claim than for a strict liability claim. "For *res ipsa loquitur* to apply, the plaintiff must plead and prove that he was injured (1) in an occurrence that ordinarily does not happen in the absence of negligence (the probability element) (2) by an agency or instrumentality within the defendant's exclusive control (the control

element)." *Johnson v. Armstrong*, 211 N.E.3d 355, 367–68 (Ill. 2022). Illinois courts emphasize that "[w]hether *res ipsa loquitur* applies is a question of law to be decided in the first instance by the trial court." *Id.* at 368.

The district court correctly concluded that no evidence in the record supported the plaintiffs' arguments on prong one. *See supra* note 5. And we also note that the plaintiffs cannot establish the control prong either. The uniforms here were manufactured in many different factories and shipped across the world by multiple intermediaries. So, Twin Hill had long since relinquished control over them. By the time the uniforms were tested, moreover, many had been washed and worn, eroding Twin Hill's control even further. No res ipsa loquitur inference could prove that the plaintiffs were injured as a result of negligent manufacturing by Twin Hill. That is presumably why plaintiffs focus their arguments on the *Tweedy* doctrine more than traditional res ipsa loquitur.

The district court properly granted summary judgment to the defendants on both of plaintiffs' products liability theories.

## V. Conclusion

Seeing no jurisdictional problem, we adopt the district court's well-reasoned opinion in full. And for the reasons explained, neither the *Tweedy* doctrine nor res ipsa loquitur help the plaintiffs satisfy their evidentiary burden on their products liability theories.

AFFIRMED